**UNITED STATES of America,**
**Plaintiff,**

v.

**Frederick S. BROVERMAN and M.**
**Broverman & Son, Defendants.**

United States District Court
S. D. New York.

Nov. 25, 1959.

S. Hazard Gillespie, Jr., U. S. Atty., New York City, for the United States. Anthony R. Palermo, Asst. U. S. Atty., Rochester, N. Y., Edwin F. Rains, Chief Counsel, Foreign Assets Control, Washington, D. C., of counsel.

Corcoran, Kostelanetz, Gladstone & Lowell, New York City, for defendants. Boris Kostelanetz, Jules Ritholz, Arthur B. Kramer, Maurice N. Nessen, New York City, of counsel.

WEINFELD, District Judge.

The defendants move to dismiss all counts of a five-count indictment on the ground that no count charges an offense against the United States.

The first two counts charge violation of section 5(b) of the Trading with the Enemy Act, 50 U.S.C.A.Appendix, § 5 (b), and regulations issued thereunder in that, on two separate occasions, the defendants wilfully imported a quantity of hog bristles, the country of origin of which was China (other than Formosa).

The third and fourth counts charge that with respect to the foregoing importations, the defendants wilfully made false statements on United States Customs' forms in violation of 18 U.S.C. § 542.

The fifth, the inevitable conspiracy count, charges that the defendants conspired to commit the substantive crimes charged in the first four counts.

Section 5(b) (1) (B) of the Trading with the Enemy Act, insofar as here pertinent, empowers the President or his designee to:

"* * * * regulate * * * or prohibit, any * * * importation * * * involving, any property in which any foreign country or a national thereof has any interest, by any person * * * subject to the jurisdiction of the United States * * *."[1]

The same section also grants power to the President to vest "any property or interest of any foreign country or national thereof" upon terms and conditions prescribed by him. Thus, the powers granted under the act relate to (1) trade activities and (2) vesting of property.

The main thrust of the defendants' attack upon counts one and two is that while they allege China (other than Formosa) is the "country of origin" of the hog bristles, there is no allegation that any *enemy* country or *enemy* national had any interest in the hog bristles; apart from this, they emphasize the counts even fail to allege in the language of the statute that China or a national thereof had "any interest" in the bristles. In sum, however, their basic contention is that only those transactions in which a foreign "enemy" has an interest come under the ban of section 5(b) of the Trading with the Enemy Act.

The indictment does not purport to charge a violation of the act qua act. Essentially it charges a violation of regulations issued under authority of the act pursuant to Executive Order 9193.[2] The Trading with the Enemy Act authorizes the President or his delegate to issue regulations to secure its enforcement [3] and makes a willful violation of a regulation a criminal offense.[4]

The specific charges against the defendants here are violations of regulation 500.204, one of a series promulgated after the outbreak of the Korean conflict.[5] In substance, it prohibits all trad-

1. 50 U.S.C.A.Appendix, § 5(b) (1) (B).

2. 7 Fed.Reg. 5205 (1942).

3. 50 U.S.C.A.Appendix, § 5(b) (1).

4. Id. § 5(b) (3).

5. Foreign Assets Control Regulations § 500.204, 17 Fed.Reg. 11718 (1952).

ing in merchandise originating in Communist China or North Korea except that which may be authorized by governmental license. Chinese hog bristle is one of the prohibited items.

The direction of the defendants' attack is twofold: first, that the act itself requires as an essential element of the offense that "enemy taint" attach to the importation of the hog bristles. This is based upon the contention that the President's authority under section 5(b) (1) (B) of the act to prohibit transactions involving any property "in which any foreign country or a national thereof has any interest" is limited to "a foreign enemy country" and an "identifiable property interest"; second, that since the regulation fails to refer to foreign taint or foreign interest, it exceeds the grant of authority under the act and is void.

Both contentions stem from Clark v. Uebersee Finanz-Korporation,[6] which centered about the vesting provision of section 5(b) (1) (B) of the act. The defendants read this case as holding that the President's power to vest is restricted to property in which an "enemy" country or a national thereof has an identifiable interest. Accordingly, the defendants argue that since the President's power to prohibit trading activities is contained in the same section which gives him power to vest property, a fortiori, his power to proscribe trading activities is similarly restricted to "enemy tainted" transactions. The argument is based upon a statement in the Court's opinion that:

" * * * the phase of the problem with which we are presently concerned and with which Congress was wrestling when it amended the Act in 1941 started and ended with property having an enemy taint. We find not the slightest suggestion that Congress was concerned under this Act with property owned or controlled by friendly or neutral powers and in no way utilized by the Axis." [7]

Defendants' counsel have misconceived the issue involved in that case and have misunderstood the Court's holding. The issue was not the power of the President to vest foreign funds belonging to a nonenemy alien. The power to seize and vest all property, of any foreign country or foreign national, even that of friendly or neutral nations, was not questioned. Indeed, it was expressly recognized. What was at issue was the remedy, if any, available to a nonenemy alien for the return of his vested property if he could prove the absence of foreign taint.

Specifically, the basic issue in the Uebersee case was whether the amendment of section 5(b) in 1941, which broadened the vesting power, restricted or rendered inoperative section 9(a) of the act, 50 U.S.C.A.Appendix, § 9(a), which granted "any person not an enemy or an ally of enemy" the right to reclaim vested property. The Court held that the right granted under section 9(a), which had not been amended, was not wiped out by the amendment to section 5(b). Significantly, after pointing out the various subterfuges which had been employed for concealing enemy ownership or control of property which ostensibly was friendly or neutral, the Court stated that:

"Sec. 5(b) was amended on the heels of the declaration of war to cope with that problem. Congress by that amendment granted the President the power to vest in an agency designated by him 'any property or interest of any foreign country or national thereof.' The property of *all* foreign interests was placed within reach of the vesting power, not to appropriate friendly or neutral assets but to reach enemy interests which masqueraded under those innocent fronts." [8]

6. 1947, 332 U.S. 480, 68 S.Ct. 174, 92 L. Ed. 88.

7. Id. at 487, 68 S.Ct. at 177.

8. Id. at 485, 68 S.Ct. at 176. Emphasis supplied.

\* \* \* \* \* \*

"The power of seizure and vesting was extended to all property of any foreign country or national so that no innocent appearing device could become a Trojan horse." [9]

Thus, the case not only did not hold that the power to vest was restricted to enemy tainted property, but on the contrary, recognized the broadened power under section 5(b) to vest property of friendly as well as enemy foreign interests.[10] The Court, however, further held that a friendly alien whose property had been seized under the vesting power still had access to the courts to secure its return under section 9(a). Indeed, any other ruling would have raised serious constitutional questions involving a taking of property of friendly aliens without just compensation.[11]

■ Thus, the basic premise of the defendants' contention falls. Since the President's power to vest extends to all property, whether that of a friendly, an unfriendly, or an enemy nation or national, it follows there is no support for defendants' view that, similarly, the power to prohibit trading activities is circumscribed to "enemy tainted" transactions.

To uphold the defendants' position would strip the power of government under the act to deal with problems arising out of hostile acts by unfriendly nations who are not "enemies" as defined under section 2 of the act.[12] Such a construction would "run counter to the policy of the Act and be disruptive of its

purpose"; it would deny the 1941 amendment to section 5(b) the broadened scope necessary to "fulfill its mission."[13]

■ Accordingly, the Court concludes that a crime charged under section 5(b) of the Trading with the Enemy Act, involving the importation of prohibited merchandise, does not require, either as a matter of pleading or proof, that the merchandise was "enemy tainted."

The defendants make a further and alternative attack. Here, in substance, they argue that even if enemy taint is not an essential of the crime, nonetheless, a requisite is, in the language of section 5(b), that the transaction involve property in which a "foreign country or a national thereof has [an] interest." Specifically, the claim is that because counts one and two do not allege that China or any Chinese national had any interest in the imported hog bristles, they fail to charge a crime. Again, the defendants assert that regulation 500.204 exceeds the scope of delegated authority. The regulation insofar as pertinent provides:

"(a) Except as specifically authorized by the Secretary of the Treasury \* \* \* no person subject to the jurisdiction of the United States may \* \* \* import, or otherwise \* \* \* engage in any transaction with respect to any merchandise outside the United States if such merchandise is:

"(1) Merchandise the country of origin of which is China (except Formosa) or North Korea.

\* \* \* \* \* \*

9. Id. at 488, 68 S.Ct. at 178.

10. See Silesian-American Corp. v. Clark, 1947, 332 U.S. 469, 479, 68 S.Ct. 179, 184, 92 L.Ed. 81, in which the Court said, "This broadening of the scope of the Custodian's power to vest so as to include interests of friendly aliens in property includes the power to vest the interest which friendly aliens have from pledges." Similarly in Kaufman v. Societe Internationale, 1952, 343 U.S. 156, 159, 72 S.Ct. 611, 612, 96 L.Ed. 853 the Court, summarizing its holding in the Uebersee case, said, "We there held that the 1941

amendment authorized the Custodian to seize and vest in himself all property of any foreign country or national, even that of friendly or neutral nations."

11. Guessefeldt v. McGrath, 1952, 342 U.S. 308, 318, 72 S.Ct. 338, 96 L.Ed. 342; Russian Volunteer Fleet v. United States, 1931, 282 U.S. 481, 51 S.Ct. 229, 75 L. Ed. 473.

12. 50 U.S.C.A.Appendix, § 2.

13. Clark v. Uebersee Finanz-Korporation, 1947, 332 U.S. 480, 488, 489, 68 S.Ct. 174, 178, 92 L.Ed. 88.

"(vii) Bristles, hog, * * *."

It will be observed that this regulation makes no reference to the language of the act, " * * * transactions involving, any property in which any foreign country or a national thereof has any interest." Accordingly, the defendants read the regulation as dispensing altogether with the element of foreign interest and conclude that it exceeds the scope of the act. The Government, on the other hand, emphasizes that the very terms of the regulation make it clear that it applies only to those transactions in property in which a foreign government or a foreign national has an interest. It cites the fact that the regulation prohibits transactions only with respect to "merchandise outside the United States" which originated in China or North Korea. It argues that if these two conditions are met, then necessarily the merchandise is property in which there is a foreign interest sufficient to satisfy the requirements of section 5(b).

The question then presented is whether merchandise which is outside the United States and which has its origin in China is property in which "any foreign country or a national thereof has any interest" within the meaning of section 5(b). If so, then regulation 500.-204 is valid and counts one and two are immune from attack.

The act itself does not define "any interest" of a foreign country or a national thereof. However, present and predecessor regulations have defined the term to mean "interest of any nature whatsoever, direct or indirect."[14] These regulations have had specific congressional approval [15] and clearly manifest a purpose to give broad sweep to the words "any interest."

Regulation 500.204 was one of a series of Foreign Assets Control Regulations issued after the Korean conflict to meet problems arising out of communistic aggression in the Far East. They were designed in part to deprive Communist China of foreign exchange required to further its aggressive activities. Current events emphasize the importance of economic sanctions to meet activities directed against our welfare and security.

 The regulation here in question was aimed to supplement direct prohibitions against trade with Communist China by preventing indirect or clandestine access to the American market for Chinese products through intermediaries in friendly or neutral countries. Communist China has an interest in the ultimate exportation to this country, whether effected directly or indirectly, of any of its native products which would help to sustain its internal economy and provide it with foreign exchange. This interest is not limited to a pecuniary benefit involved in a particular transaction. It is far more comprehensive and transcends particular shipments. It is a continuing interest. This interest extends to all Chinese products which have a market in the United States. Chinese "merchandise outside the United States" does not yield to China needed foreign currency. China has an interest in moving such merchandise into the United States in order to obtain the currency. Thus, a transaction involving goods of Chinese origin "outside the United States" is one involving "property in which [a] foreign country or a national thereof has [an] interest," as specified in section 5(b) of the act. Thus, it is clear that regulation 500.204 which prohibits unlicensed transactions "in merchandise outside the United States," the country of origin of which is China comes within the ambit of the act and is valid. Under the circumstances, it is not required that the indictment specify in precise statutory lan-

14. See Regulations promulgated under Executive Order No. 8389 of April 10, 1940, §§ 130.3, 130.4(a), (a)(1), 86 Cong.Rec. 5170–71 (1940); General Ruling No. 4 (a) (3), 31 C.F.R.App. A at p. 8844 (1943 Cum.Supp.). See also 31 C.F.R. § 500.312 (1959).

15. Act May 7, 1940, § 2, 54 Stat. 179; Act Dec. 18, 1941, § 302, 55 Stat. 840.

guage that China or a Chinese national has an interest in the hog bristles, the property referred to in the first two counts. These counts, in accordance with the requirements of Rule 7 of the Federal Rules of Criminal Procedure, set forth a plain and concise statement of the essential elements of the offense charged under the act and the specific regulation which it is claimed the defendants violated. The indictment is sufficiently specific to furnish the defendants with the information necessary to safeguard their rights, to enable them to prepare their defense and to meet the Government's case.

■ The defendants further attack regulation 500.204 as being in conflict with another regulation in effect on the date of the commission of the offenses charged in counts one and two. The so-called conflicting regulation is section 500.512.[16] In substance, it authorized transactions incident to trade with members of the "authorized trade territory" provided that the transaction was not for, or by, or on behalf of, any national not within the authorized trade territory and provided that such transaction did not involve property in which such a national had "any interest" since December 17, 1950, the effective date. Members of the authorized trade territory included the nations of the non-communist world.[17] In short, the defendants claim that section 500.512 constituted a general or blanket license provided the conditions therein were met. A transaction which seemingly may have been authorized under the general provisions of section 500.512 may have been condemned under the more specific provisions of section 500.204 which were directly aimed towards Chinese products. However, it does not follow that the two

regulations are in irreconcilable conflict,[18] but only that the more general prohibition of 500.512 is circumscribed by the more specific prohibition of 500.204. In that situation, the specific governs.[19] The indictment here charges that the transactions were engaged in without authorization by the Secretary of the Treasury. This sufficiently charges that the defendants were engaged in the alleged transactions without the required authority, either general or specific.

Neither is there substance to the suggestion that the repeal in August 1954 of section 500.512 [20] is ex post facto legislation. The indictment charges that the acts occurred in March and May of 1954. Regulation 500.204 which defendants are charged with violating was then in full force and effect and remains unrepealed. The fact that another regulation, general in nature, was repealed some four or five months after the date of the crimes charged in the indictment is of no moment.

■ Equally without merit is the final contention that counts one and two must be stricken because they fail to specify the dates for origination from China of the shipments involved. Regulation 500.-204 prohibits the unlicensed importation of all goods of Chinese origin. Hence, the issue is whether the goods are of Chinese origin, not when they originated from China. The defendants contend that unless the goods originated after December 17, 1950, the effective date of the first regulation prohibiting transactions with Communist China, the charges in the two counts bear no reasonable relationship to the purposes of the Trading with the Enemy Act. This argument overlooks the fact that the regulation does not place an absolute ban on

---

16. 15 Fed.Reg. 9045 (1950).

17. Section 500.322(a), 15 Fed.Reg. 9043 (1950).

18. See Townsend v. Little, 1883, 109 U.S. 504, 512, 3 S.Ct. 357, 27 L.Ed. 1012; Sanford v. Sanford, 1923, 52 App.D.C. 315, 286 F. 777, 780.

19. State of Missouri v. Ross, 1936, 299 U.S. 72, 76, 57 S.Ct. 60, 81 L.Ed. 46; Ruth v. Eagle-Picher Co., 10 Cir.. 1955, 225 F.2d 572, 574; Karrell v. United States, 9 Cir., 1950, 181 F.2d 981, 986-87, certiorari denied, 340 U.S. 891, 71 S.Ct. 206, 95 L.Ed. 646.

20. 19 Fed.Reg. 5483 (1954).

trade in Communist Chinese goods. Licenses to import may still be granted upon proof that goods outside the United States which are sought to be imported actually left China before December 17, 1950 and have been free of Communist Chinese interest since that date. Under this circumstance, the regulation is not subject to condemnation as being unreasonable.

■ The defendants also seek to dismiss the third and fourth counts of the indictment, which charge violations of Title 18 U.S.C. § 542, in that with respect to the two separate occasions referred to in counts one and two the defendants unlawfully made a material false statement in a United States Customs' form to the effect that the country of origin of imported hog bristles was India when in fact it was China (other than Formosa). The defendants attack these counts on the grounds that the alleged false statements are immaterial as a matter of law and that the indictment fails to plead facts disclosing materiality. The contentions are without merit. There can be no doubt of the materiality of the country of origin of the merchandise under 500.204. A false statement as to origin, in the case of goods which do in fact originate in China, would result in their admission. If, however, the true origin were divulged, they would be excluded. Clearly, the statements are material,[21] and their materiality appears from the very face of the indictment.[22]

The defendants' contention with regard to the fifth count which charges a conspiracy to violate section 5(b) of the Trading with the Enemy Act and section 542 of Title 18, U.S.C., is merely that since the substantive counts must be dismissed, the conspiracy count must follow in their wake. Since the Court has found that the first four counts are sufficient to withstand the motion to dismiss, it reaches the same conclusion with regard to the fifth.

The motion to dismiss the indictment is denied.

---

21. Cf. United States v. Silver, 2 Cir., 1956, 235 F.2d 375, certiorari denied, 352 U.S. 880, 77 S.Ct. 102, 1 L.Ed.2d 80.

22. See Markham v. United States, 1895, 160 U.S. 319, 325–326, 16 S.Ct. 288, 40 L.Ed. 441.