**BEHRING INTERNATIONAL, INC., Plaintiff,**

v.

**G. William MILLER, Secretary of the Treasury of the United States of America, The Broad Street National Bank of Trenton, New Jersey, Richard P. Brown, Jr., Colonel A. Zarrabi, Robert W. Delventhal, and George A. Murphy, Co-Trustees, Defendants.**

Civ. A. No. 80–2864.

United States District Court, D. New Jersey.

Dec. 24, 1980.

Crummy, Del Deo, Dolan & Purcell by Robert W. Delventhal, Newark, N. J., for plaintiff.

Dwight D. Meier, U. S. Dept. of Justice, Michael J. Malloy, U. S. Dept. of Treasury, Washington, D. C., for defendants.

## OPINION

SAROKIN, District Judge.

This is an action in which plaintiff seeks a declaratory judgment and a writ of mandamus for the immediate release of $503,-000.00. Plaintiff, Behring International, Inc. ("Behring"), is a Texas corporation authorized to do business in New Jersey. Defendant G. William Miller, the Secretary of the Treasury ("Secretary"), is authorized to carry out the provisions of the Iranian Assets Control Regulations. Included as de-

fendants in this action are the Broad Street National Bank of Trenton and the individual trustees [1] of the account in which the subject money is being held.

## FACTUAL BACKGROUND

In August 1975, plaintiff Behring entered into a written agreement with the Imperial Iranian Air Force ("I.I.A.F."), presently known as the Islamic Republic Iranian Air Force ("I.R.I.A.F."). In that agreement Behring agreed to provide the I.I.A.F. with personnel and warehouse space at Behring's Edison, New Jersey warehouse facility to be used for receiving, repacking, palletizing, containerizing and storing I.I.A.F.'s shipments. In September 1977, Behring entered into a second and separate agreement with the Iran Aircraft Industries ("I.A.C. I."), whereby plaintiff agreed to provide I.A.C.I. with substantially the same services provided for the I.I.A.F.

As of January 31, 1979, I.I.A.F. owed Behring the sum of $390,474, and $631,744 was due Behring from I.A.C.I. for authorized warehousing services rendered and costs incurred and paid by Behring on behalf of I.I.A.F. to carriers for shipment of freight. On February 28, 1979, Behring filed a complaint and sought a temporary restraining order and order to show cause why a writ of attachment should not issue in federal district court. Behring alleged that the I.I. A.F. and I.A.C.I. had breached their respective agreements with Behring and sought compensatory, consequential and punitive damages, as well as an order restraining the I.I.A.F. and I.A.C.I. from removing any property from the jurisdiction of the court or the United States, or from cancelling a certain letter of credit issued in Behring's favor.

After extensive litigation, including an appeal to the Third Circuit Court of Appeals, the parties entered into settlement negotiations and reached an agreement on November 7, 1979. The Settlement Agreement was designed to settle all claims be-

---

**1.** The individual trustees of the account are Richard P. Brown, Jr., Colonel A. Zarrabi, Rob- ert W. Delventhal, and George A. Murphy.

**554**

tween the parties arising out of the execution and performance of the agreement for freight forwarding services between the I.I. A.F., I.R.I.A.F. and Behring and any claims arising out of the execution and performance of the agreement for freight forwarding services between I.A.C.I. and Behring entered into in September 1977.

The agreement provided that all materials were to be removed from the Edison warehouse prior to December 15, 1979; "if said materials [had] not been removed from the Edison warehouse prior to December 15, 1979, Behring [would] nevertheless receive all payments to which it [was] entitled under the Settlement Agreement unless such inability to remove them [was] caused or contributed to by the conduct of Behring." The agreement also provided that when the conditions of settlement had been either fulfilled, waived or satisfied,

> and all I.R.I.A.F. and I.A.C.I. goods presently in the Edison warehouse have arrived at McGuire AFB on or before December 15, 1979, whichever is earlier (provided that the failure of the goods to reach McGuire AFB has not been caused or contributed to by the conduct of Behring), I.R.I.A.F. and Behring will join in a request for a consent order directed to the District Court to order such sum to be paid to Behring out of the Trust Account as is necessary to complete payment of the amounts owed by I.R.I.A.F., I.A.C.I. and the Iranian Navy to Behring, plus $1,000,000 and any additional amount remaining in the Trust Account is to be returned to I.R.I.A.F., exclusive of interest which accrues after the execution of

this Agreement on all sums to which Behring is entitled pursuant to the terms hereof, which accrued interest shall be paid to Behring.

The above sums were to be deposited in an interest-bearing Trust Account established with the defendant bank pursuant to an order of the district court.[2]

An additional sum of $865,000 was deposited to the aforesaid trust account pursuant to the terms of the settlement agreement on or after November 9, 1979, and prior to November 14, 1979.[3] On that same date, the sum of $635,000 was withdrawn from the account and paid to Behring pursuant to the Agreement. On November 9, 1979 a consent order was entered by the court incorporating by reference the terms of the agreement of the parties.[4]

On November 4, 1979, a number of Americans were taken hostage in Iran. Responding to that action, on November 14, 1979, President Carter imposed Executive Order 12170, declaring a national emergency, and stating that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States." The President then ordered blocked all property and interests in property of the Government of Iran, its instrumentalities and controlled entities and the Central Bank of Iran which are or come within the possession or control of persons subject to the jurisdiction of the United States. Regulations were enacted by the Treasury in order to carry out said executive order. Said regulations provide that no transactions may take place in the

---

2. The Trust Account was established pursuant to an Order signed in *Behring International, Inc. v. Imperial Air Force*, Civil No. 79–675, dated April 19, 1979, which incorporated a negotiated agreement between the parties. The I.R.I.A.F. agreed to deposit certain checks drawn upon the U.S. Treasury made payable to and endorsed by Colonel Khatami of the I.R.I. A.F. to the Trust Account. The total amount to be deposited would be later determined either by the court or settlement by the parties.

3. On November 14, 1979, Executive Order 12170 was effectuated which declared blocked all property and interests in property of the

Government of Iran, its instrumentalities and controlled entities. Regulations were promulgated pursuant to this Order which provided that licenses from the U. S. Department of the Treasury were needed in order to effectuate any transfers which affected interests in Iranian property. See *infra*.

4. The agreement also provided that concurrent with the deposit of the $635,000, all restraints imposed upon materials of I.R.I.A.F. and I.A. C.I. were dissolved. The district court also retained jurisdiction over the subject matter of the agreement.

absence of a license from the United States Treasury Department.[5]

On December 11, 1979, the defendant bank advised Behring that the Treasury Department had notified the bank that the funds held by it were blocked and that a special license was required from the Office of Foreign Asset Control (OFAC) in order to make a transfer. Behring then prepared an application for a license in accordance with the regulations. Behring also submitted an application to OFAC for an additional license on January 24, 1980 which would enable Behring to move certain I.R.I. A.F. and I.A.C.I. goods to McGuire Air Force Base (AFB) in order to free the warehouse and place the goods under United States government control. On April 29, 1980, a partial license was granted in the amount of $500,000. Simultaneously, the goods from the Edison, New Jersey warehouse were transferred to McGuire AFB.

A verified complaint was filed by Behring on September 2, 1980, seeking a declaratory judgment and writ of mandamus for the immediate release of $503,000 on the following grounds: first, Behring claimed that the funds were not blocked by the regulations because neither Iran nor its instrumentalities or controlled entities had any interest therein; second, assuming the transfer of the funds after the effective date, that said transfer, if any, constituted a transfer solely for the purpose of payment of an obligation of an Iranian entity owed to plaintiff and authorized under § 535.904 of the regulations; third, assuming the funds were otherwise blocked or frozen, that neither Iran nor any Iranian entity had any interest therein as of December 15, 1979; or fourth, a judgment of mandamus that the defendant Secretary's failure and/or refusal to issue a license pursuant to the Regulations unblocking the balance of the funds in question was and is arbitrary, capricious, unlawful, unconstitutional and contrary to the applicable law and regulations, including but not limited to, the International Emergency Economic Powers Act, thereby entitling the plaintiff to an order in the nature of mandamus compelling defendant Secretary to grant plaintiff's application for a specific license pursuant to the regulations.

 Plaintiff Behring bases federal jurisdiction over any action in the nature of mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty owed to the plaintiff. Alternatively, jurisdiction is founded upon the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02 (1976).[6]

---

**5.** The regulations provide that

(a) No property subject to the jurisdiction of the United States or which is in the possession of or control of persons subject to the jurisdiction in which on or after the effective date Iran has any interest of any nature whatsoever may be transferred, paid, exported, withdrawn or otherwise dealt in except as authorized;

31 C.F.R. § 535.201 (1980).

Property or property interests are defined to include "money, checks, drafts, bullion, bank deposits, savings accounts, debts, indebtedness, obligations, notes, debentures, stocks, bonds, coupons, any other rights in the nature of security, warehouse receipts, bills of sale, any other evidence of title, ownership or indebtedness ..."

31 C.F.R. § 535.311 (1980).

**6.** Defendant Miller contests the dual bases of jurisdiction of the court to hear this matter. Title 28, section 1361, provides that

[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the

United States or any agency thereof to perform a duty owed to the plaintiff.

28 U.S.C. § 1361 (1976). In order for a district court to have jurisdiction under the Mandamus Act it is necessary that the plaintiff has pleaded a cause of action under the particular jurisdictional statute. *Mattern v. Weinberger*, 519 F.2d 150, 156 (3d Cir. 1975), *vacated sub nom. Mattern v. Mathews*, 425 U.S. 987, 96 S.Ct. 2196, 48 L.Ed.2d 812 (1976), *remanded*, 427 F.Supp. 1318 (E.D.Pa.1977), *rev'd*, 582 F.2d 248, *cert. denied*, 443 U.S. 912, 99 S.Ct. 3101, 61 L.Ed.2d 876 (1979). This court has jurisdiction under the Act since the plaintiff has adequately pleaded a cause of action requiring the Secretary of the Treasury, an employee of the United States, to perform a duty to the plaintiffs, namely, to release certain "frozen" assets, or alternatively to issue a license to the plaintiff in the amount of those assets.

With respect to the alternative basis of jurisdiction, the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02 (1976), the court agrees with the defendant that the Act only enlarges the range of available remedies in federal courts

## DISCUSSION

The Iranian Assets Control Regulations were promulgated by the Secretary of the Treasury in response to the national emergency created by the turmoil in Iran and the seizure of American hostages. Those regulations prohibit any transactions of property in which Iran has an "interest" as of 8:10 a. m., est., November 14, 1979, the effective date. The term interest has been accorded a broad definition, including "an interest of any nature whatsoever, direct or indirect." 31 C.F.R. 535.312.

The regulations were promulgated pursuant to the power delegated to the President under the International Emergency Economic Powers Act ["IEEPA"]. The IEEPA grants to the President enumerated powers "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." Pub.L. 95–233, § 201 et seq., 91 Stat. 1626 (codified in 50 U.S.C. §§ 1701 et seq. (Supp. II 1978)) See generally H.R.Rep.No.95–459, 95th Cong., 1st Sess. (1977).[7]

Plaintiff submits that the above regulations are inapplicable in this case, because Iran has no interest in the subject funds. The plaintiff was denied a license for leave to transfer said funds by defendant. The decision of the Secretary may be reviewed by this court in a limited manner. This court must consider whether the determination of the Office of Foreign Assets Control was unreasonable, arbitrary, capricious or an abuse of discretion. Sardino v. Federal Reserve Bank of New York, 361 F.2d 106 (2d Cir. 1965), cert. denied, 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1966); see Veterans & Reservists for Peace in Viet-Nam v. Regional Commissioner of Customs, 459 F.2d 676 (3d Cir.), cert. denied, 409 U.S. 933, 93 S.Ct. 232, 34 L.Ed.2d 188 (1972). That decision, in turn, depends upon a determination of whether or not Iran has an interest in the subject fund.

"Interest" has been defined by regulation to encompass a wide range of matters. Specifically, the regulation provides that "interest" includes "money, checks, drafts, bullion, bank deposits, savings accounts, debts . . . and any other property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future or contingent." 31 C.F.R. § 535.311.

Within the context of a similar statute, the Trading with the Enemy Act [TWEA], courts have defined the meaning of the term "interest". In United States v. Broverman, 180 F.Supp. 631 (S.D.N.Y.1959) the defendants were charged with illegally importing a quantity of hog bristles from China. The defendants sought to dismiss the indictment on the basis of the fact that China did not have an interest in the imported hog bristles. The court examined the regulations under the TWEA and stated that:

> The act itself does not define 'any interest' of a foreign country or a national thereof. However, present and predecessor regulations have defined the term to mean "interest of any nature whatsoever, direct or indirect". These regulations

---

but does not provide an independent basis for jurisdiction. Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950); McCahill v. Borough of Fox Chapel, 438 F.2d 213, 214 (3d Cir. 1971).

**7.** The statutory authority of the President contained in the IEEPA may be traced to the Trading with the Enemy Act [TWEA] passed by Congress in 1917. Ch. 106, § 1, 40 Stat. 411 (1917) (codified in 50 App. U.S.C. §§ 1–39, 41–44 (1976)). The Act allowed the President to regulate trade and property interests of an "enemy". Except for Section 5(b), its provisions apply only during a Congressionally declared war. Section 5(b) permits the President to regulate transactions involving property in which any foreign country or national thereof has any interest . . . ." 50 App. U.S.C. § 5(b)(1) (1976). In 1977 Congress amended the Act such that its applicability no longer extended to emergency or non-war situations. At the same time, the void was filled by the IEEPA which permits Presidential action with respect to foreign property in an emergency declared by the President. See Roth, Statutory Basis for the Iranian Asset Freeze, 3 Corp.L. Rev. 165 (1980).

have had specific congressional approval and clearly manifest a purpose to give broad sweep to the words "any interest." *Id.* at 636. The extent of the "interest" in that case was that China was found to have "an interest in the ultimate exportation to this country, whether effected directly or indirectly, of any of its native products which would help to sustain its internal economy and provide it with foreign exchange." *Id.*

In *Welch v. Kennedy*, 319 F.Supp. 945 (D.D.C.1970) the district court recognized the "broad purpose of the Act" [TWEA] which was "to give the President full power to conduct economic warfare against belligerent nations in time of war or national emergency." *Id.* at 946–47. Plaintiff Welch, a Quaker, sought to donate money to a Canadian organization which was providing medical supplies to noncombatants in North and South Vietnam. The term "interest" was construed to include commercial transactions and donative transfers. Therefore, defendant's denial of a license was upheld by the court.[8]

The "interest" of Iran in the funds held in the subject trust account may be contingent or *de minimus* as the plaintiff Behring has argued. The intent of the Secretary, acting within his power under the IEEPA, is to freeze all Iranian property interests within the jurisdiction of the United States for the duration of the national emergency. 31 C.F.R. § 535.201.

The terms and conditions of the subject settlement agreement indicate that Iran had an interest in the funds and continues to have an "interest" therein. The Agreement provides that after payment to plaintiff, any residual amount in the account will be returned to Iran.[9] That residual amount, in which Iran has an interest pursuant to the terms of the Agreement, has not been determined. Being undetermined, the amount in which Iran has an interest may not be severed from the plaintiff's interest in the account. The account represents an asset in which both parties have an interest. As such, the account remains blocked in accordance with the Executive Order and the regulations promulgated thereunder. Accordingly, the defendant's determination not to permit a transfer of said funds was neither arbitrary, capricious nor unreasonable.

The record in this matter, however, clearly reflects that, in the absence of the Executive Order, plaintiff would be entitled to an immediate determination and possession

---

8. For further indications of the breadth of similar blocking orders see *United States v. Quong*, 303 F.2d 499, (6th Cir.), *cert. denied*, 371 U.S. 863, 83 S.Ct. 119, 9 L.Ed.2d 100 (1962) (Construing § 5(b) of the TWEA the court of appeals stated "[t]he term 'any interest' must be defined in the broadest sense and includes any interest whatsoever, direct or indirect."); *Greenblatt v. Dillon*, 238 F.Supp. 267, 269 (E.D. Mo.1964) (Antique Chinese furniture purchased in Singapore was considered to be within the proscription of the TWEA in the absence of proof that there was no "Communist Chinese interest in the property as intended by the Foreign Assets Control Regulations.")

9. Paragraph 16 of the Agreement provides that "[w]hen all of the foregoing conditions of settlement have been either fulfilled, waived or otherwise satisfied, . . . I.R.I.A.F. and Behring will join in a request for a consent order directed to the District Court to order such sum to be paid to Behring out of the Trust Account as is necessary to complete payment of the amounts owed by I.R.I.A.F., I.A.C.I. and the Iranian Navy to Behring, plus $1,000,000 and *any additional amount remaining in the Trust Account*

*is to be returned to I.R.I.A.F.*, exclusive of interest which accrues after the execution of this Agreement on all sums to which Behring is entitled pursuant to the terms hereof, which accrued interest shall be paid to Behring." (Emphasis added.)

The Settlement Agreement also provides for other rights and interests of which Iran or Behring could avail themselves during the period following the promulgation of the OFAC regulations. For example, in order to release any monies from the trust account, the signature of Colonel A. Zarrabi, a member of the Iranian Air Force, was needed. Complaint ¶ 5. Arbitration was available to mediate any disagreements arising from the payment of any sum to Behring. Settlement Agreement ¶ 6. Certain deductions from the settlement amount were provided for in the event Behring returned any items paid for by Iran to the vendor. Settlement Agreement ¶ 9. Iran also had the right to require Behring to produce various documents and information. Settlement Agreement ¶ 13.

of the account, subject only to the possible reduction of a minimal amount. One of the primary justifications for the validity of such executive orders is to confer upon the President the flexibility to deal in foreign relations. See *United States v. Curtiss-Wright Export Co.*, 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936); *Sardino v. Federal Reserve Bank of New York*, 361 F.2d 106 (2d Cir. 1966), *cert. denied*, 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1966). The court takes judicial notice of the highly sensitive ongoing negotiations involving the Iranian hostages and the fact that the assets which have been blocked by executive order play a critical role in those negotiations. On the other hand, in moments of crisis the courts should be particularly zealous in protecting individual rights.

The upholding of the Executive Order in this matter does nothing more than preserve the *status quo* while permitting the President to retain flexibility in his dealings for the release of the Iranian hostages. The enforcement of the order in this matter does not constitute a disposition of the funds.

So long as citizens of this country remain hostage to a foreign power, the Executive must have the means to deal with that situation. The rights of the plaintiff, in the interim, have not been violated or altered, but on the contrary are preserved as against the subject fund. Even if said funds were ultimately utilized by the government in obtaining the release of the hostages, this court can envision no circumstances under which the plaintiff would not be entitled to compensation from the government. No matter how just the cause, an individual's property may not be utilized by the government without due process and just compensation. U.S.Const. Amend. V.

The plaintiff seeks a writ of mandamus directed to the Secretary of the Trea-

sury to issue a specific license to Behring unblocking the trust account funds. The prerequisites to the issuance of a writ of mandamus are: (1) a clear right in the plaintiff to the relief sought; (2) a plainly defined and peremptory duty on the defendant's part to do the act in question; and (3) lack of another available remedy. *Billiteri v. United States Board of Parole*, 541 F.2d 938 (2d Cir. 1976).

A writ of mandamus must be denied since plaintiff Behring cannot meet the foregoing standards. Since it has been established that Iran had an interest in the trust account on November 14, 1979, and continues to have an interest in that account, the granting of a license is a matter within the discretion of the Secretary of the Treasury pursuant to the OFAC regulations. There has been no abuse of discretion, since the failure of the Secretary to issue a license is based upon the continuing interest of Iran in said account.[10] For the same reasons, plaintiff's request for a declaratory judgment in its favor must be denied.

---

10. Plaintiff suggests that the prior granting of a license for the unblocking of a portion of the funds is inconsistent with defendant's present refusal to issue a license for the remaining funds in the account. Plaintiff was issued a license for the funds on the basis of hardship.

This is not inconsistent with the Department's subsequent refusal, since the regulations indicate that licenses may be granted in those cases where there is a "hardship". See 31 C.F.R. §§ 535.502(c), 535.567 (1980).