# Diverting Oil Imports to United States Allies

The International Emergency Economic Powers Act would authorize the President, in order to deal with an Iranian cutoff of oil to United States allies, to require American oil companies and foreign entities they control to ship oil they acquire abroad to certain specified nations and in certain specified quantities. While there must be a "foreign interest" in the oil for the President to invoke IEEPA's powers, foreign interest unassociated with the nation that is creating the emergency would be sufficient.

Section 232(b) of the Trade Expansion Act would allow the President to impose a quota on oil imports for national security reasons, including reasons relating to foreign policy considerations; however, it would not give him power to direct the diversion of oil imports to other countries.

January 12, 1981

MEMORANDUM OPINION FOR
THE ASSOCIATE ATTORNEY GENERAL

Iran may end or reduce exports of its oil to some of our allies who are heavily dependent on Iranian oil. You have asked us whether the President has authority to divert to those allies shipments of foreign oil that would otherwise be imported into the United States. We believe the President has this authority over at least some such shipments. There are several possible sources of authority; the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701–1706 (Supp. I 1977), seems the clearest and most appropriate.

## I. The International Emergency Economic Powers Act

We believe that the IEEPA empowers the President, in dealing with a declared national emergency, to require American oil companies and entities they control to sell any oil they acquire or can acquire abroad—except perhaps oil the company itself already owns, free of all foreign rights—and to sell it only to nations specified by the President and in quantities the President specifies. If the President enters such an order to deal with the Iranian hostage crisis, or the emergency declared in connection with the Soviet invasion of Afghanistan, he need not declare another national emergency. If the need to divert oil shipments arises from a separate emergency, that emergency should be declared. [1]

---

[1] We would alert you to Congress' injunction that "emergencies are by their nature rare and brief, and are not to be equated with normal, ongoing problems. A national emergency should be declared

Continued

295

Section 203(a)(1)(B) of the IEEPA, 50 U.S.C. § 1702(a)(1)(B), authorizes the President, in dealing with a national emergency, to:

> investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest;

by any person, or with respect to any property, subject to the jurisdiction of the United States.

On its face this provision appears to give the President power to require American companies, and foreign entities they control,[2] to ship oil they acquire abroad to certain other nations and in certain quantities.

The principal difficulty with the President's using this power is that it is unclear whether all oil acquired abroad by American companies is "property in which [a] foreign country or a national thereof has any interest." Some oil is owned by a foreign nation or foreign national but can be acquired by an American company; this is plainly property in which there is a foreign interest, at least until after the time it is acquired. Since "any" interest will suffice, we believe that oil in which a foreign nation or national has a contract right—for example, a right to refuse to allow the oil to be shipped unless a certain royalty is paid—is also subject to the President's power.

Because the United States is not now importing oil from Iran, the foreign interest will not be that of Iran, and will probably not be that of an Iranian national; it may be argued that § 203(a)(1)(B) does not reach property in which the only foreign interest is unassociated with the nation that is the cause of the emergency. We do not believe this argument is correct, however. Section 203(a)(1)(B) refers to "*any* foreign country or a national thereof" (emphasis added), and the legislative history of the IEEPA suggests that the principal reason for the foreign interest limitation was to prevent the President from regulating "domestic" transactions, *see, e.g.,* H.R. Rep. No. 459, 95th Cong., 1st

---

and emergency authorities employed only with respect to a specific set of circumstances which constitute a real emergency, and for no other purpose. The emergency should be terminated in a timely manner when the factual state of emergency is over and not continued in effect for use in other circumstances. A state of national emergency should not be a normal state of affairs." H.R. Rep. No. 459, 95th Cong., 1st Sess. 10 (1977).

[2] American corporations are clearly subject to the jurisdiction of the United States. *See* Restatement (Second) of Foreign Relations Law of the United States, §§ 27, 30 (1965). Foreign entities they control may also be, although they may be subject to the competing jurisdiction of the foreign country. In addition, § 203(a)(1)(B) permits the President to "regulate, [or] direct and compel, . . . [the] exercising [of] any right, power, or privilege with respect to . . . any [foreign] property." We believe this authorizes the President to require an American company to exercise its control over foreign entities in the way the President directs, at least when the direction furthers the purposes of other regulations imposed under the IEEPA.

Sess. 11 (1977), not to limit the foreign nations whose interests might be affected. Moreover, Congress probably expected the IEEPA to be used for emergencies—international monetary disorders, for example—that do not originate in any single country. Similarly, a diversion of oil imports might be an effort to coordinate our international trade in a way that serves the economic and political objectives the President is pursuing in dealing with a declared emergency. If it were, we believe that it would be the sort of action Congress expected the President to take under the IEEPA.

Some oil located abroad may be entirely owned by an American corporation and not subject to any foreign nation's or national's property or contract rights.[3] It is much more difficult to conclude that there is a foreign interest in this oil. It seems unlikely, although perhaps arguable, that a nation's ability to tax a quantity of oil, seize it or prevent its shipment by asserting eminent domain, and otherwise exert jurisdiction over it, constitute an "interest" in the oil. Some courts have suggested that a foreign nation has an "interest"—within the meaning of § 5(b) of the Trading with the Enemy Act, the predecessor of the IEEPA—in any item it exports. Those courts reasoned that by selling its products abroad a nation helps "to sustain its internal economy and provide it with foreign exchange." *See United States* v. *Broverman,* 180 F. Supp. 631, 636 (S.D.N.Y. 1959); *Heaton* v. *United States,* 353 F.2d 288, 291–92 (9th Cir. 1965). But we have substantial doubt that this is a sufficiently direct interest to permit regulation under § 203(a)(1)(B) of the IEEPA, at least if the object of the regulation is not to disrupt a nation's internal economy or deprive it of foreign exchange.[4]

---

[3] We express no opinion on the extent to which American corporations' acquisitions of oil from foreign nations may be regulated retroactively under the IEEPA.

[4] We have these doubts for several reasons. First, the language of § 203(a)(1)(B) suggests that the term "interest" should not be interpreted in a way that has no connection to its usual legal meaning. Section 203(a)(1)(B) refers to property in which a "foreign country *or a national thereof* has any interest" (emphasis added); this may suggest that the drafters intended to reach only those kinds of interests of foreign nations which could also be held by individuals. Moreover, in describing the President's powers, § 203(a)(1)(B) uses highly inclusive language—"investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer [etc.]"— that was evidently intended to cover a wide variety of possible actions. Section 203(a)(1)(B) does not use comparably inclusive language in describing the range of foreign interests covered. This may suggest that the drafters of the IEEPA did not intend the term "interest" to be extraordinarily inclusive. In ordinary legal usage, a nation would not have an "interest" in a piece of property unless it owned it or had an indirect, partial, contingent, or future interest in it, or a contract right to it; one would not ordinarily say that a nation had an "interest" in all the property located within its borders.

Second, Congress clearly intended that the President not use the IEEPA to regulate "wholly domestic" transactions. *See, e.g.,* H.R. Rep. No. 459, 95th Cong., 1st Sess. 11 (1977). We recognize that § 203(a)(1)(B), enacted as part of the IEEPA in 1977, contains the same language as § 5(b) of the Trading with the Enemy Act; the cases cited in the text interpreted this language. Congress presumably knew of these cases when it enacted § 203(a)(1)(B) in this form. But if we were to adopt the broadest possible interpretation of these cases—that a nation has an "interest" in property, within the meaning of § 203(a)(1)(B), whenever transactions in that property can have an important effect on its economy—we would allow the President to regulate wholly domestic transactions, in violation of Congress' clear intentions; foreign countries' economies may be substantially affected by wholly domestic American transactions. We see no other principled interpretation of the term "foreign . . . interest" in § 203(a)(1)(B) that would allow the President to regulate transactions in oil that is located

Continued

The President may be able to reach transactions in American-owned oil located abroad under a different provision of the IEEPA, § 203(a)(1)(A)(i), 50 U.S.C. § 1702(a)(1)(A)(i). That provision authorizes the President, in dealing with a national emergency, to "investigate, regulate, or prohibit . . . any transactions in foreign exchange . . . by any person, or with respect to any property, subject to the jurisdiction of the United States." An American company which owned oil located abroad would presumably have to deal in foreign exchange in order to sell the oil; the foreign exchange transactions associated with such sales might be regulated in a way that compelled the company to comply with the President's directions. While this provision of the IEEPA on its face seems to permit such regulation, some substantial objections can be raised. Arguably, Congress envisioned that the § 203(a)(1)(A)(i) authority to regulate transactions in foreign exchange would be invoked only where the President's concern was with the use of foreign exchange in the transaction. Congress probably did not intend the President to take advantage of the fact that foreign exchange was involved solely as a means of reaching transactions that he otherwise could not regulate. In other words, in enacting § 203(a)(1)(B) Congress may have intended to limit the President's power over transactions in property to property in which there was a foreign interest; if so, Congress would not have intended the President to use his authority over transactions in foreign exchange to circumvent that limitation. For these reasons, we have substantial doubt about the President's authority under the IEEPA to regulate transactions in oil that is located abroad but entirely owned by American companies. To the extent that the reasons for regulating such transactions are related to the fact that the transactions involve foreign exchange, the argument that § 203(a)(1)(A)(i) grants the President authority to regulate them is enhanced. On the facts as known to us, however, it is difficult to discern such a relationship.

Finally, it can be argued that while § 203(a)(1)(B) authorizes the President to "direct and compel . . . [the] acquisition" of oil in which there is a foreign interest, the foreign interest disappears as soon as an American company acquires the oil, and the President loses his power to direct the oil to a destination or otherwise to control its sale. For several reasons, we believe this argument is incorrect. As far as the text of the Act is concerned, the President has the power to "regulate" the acquisition of the oil; this suggests that he may order that it not be acquired unless it will be shipped to the destination he has designated. In addition, the President may "regulate [or] direct and compel . . . any . . . use, transfer, . . . transportation . . . dealing in . . . or transactions involving" property in which there is a foreign interest. By

within a foreign nation but wholly owned by an American corporation, at least when the purpose of the regulation is not to disrupt the foreign nation's economy. *See also Permian Basin Area Rate Cases,* 390 U.S. 747, 777, 780 (1968).

requiring oil to be shipped from one foreign country to another, the President appears to be simply regulating or directing a transfer, transportation, or dealing in the oil. Moreover, the President may "regulate, direct and compel, nullify, void, prevent or prohibit, any . . . dealing in, or exercising any right, power, or privilege with respect to" oil in which there is a foreign interest. We believe the President may, under this authority, order American companies to obligate any oil they can obtain from a foreign nation or national to other countries. These are not merely strained textual arguments designed to give the President control over essentially domestic transactions. The fact that the oil involved has a foreign origin may be significant, not adventitious. For example, the President may determine that precisely because the United States is a leading consumer of oil from other nations, it must make a special effort to aid its allies.

## II. Section 232(b) of the Trade Expansion Act

Section 232(b) of the Trade Expansion Act, 19 U.S.C. § 1862(b), appears to permit the President to respond to an Iranian oil cutoff by imposing a quota on oil imports into the United States. The effect of such a quota would depend on market conditions, but it would probably free additional supplies for our allies to purchase. The legal objections to this approach can be answered; the practical problems may be more serious.

Section 232(b) authorizes the President to "take such action, and for such time, as he deems necessary to adjust the imports of [an] article and its derivatives so that such imports will not threaten to impair the national security." The President can make such an adjustment if the Secretary of Commerce—formerly the Secretary of the Treasury, *see* Reorganization Plan No. 3 of 1979, § 5(a)(1)(B), 93 Stat. 1381—conducts an investigation and finds that an article "is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security." In March 1979, the Secretary of the Treasury completed such an investigation and concluded that imports of crude oil and oil products into the United States threatened to impair the national security.[5] *See* 44 Fed. Reg. 18,818 (1979). It is

---

[5] While this finding did not, of course, anticipate the Iranian oil cutoff with which we are now concerned, it did emphasize the risks of depending on oil from countries with which the United States might have "political disagreement[s]" and the unreliability of oil supplies from those nations. It even mentioned the Iranian revolutionary regime's reductions in oil shipments as an example. *See* 44 Fed. Reg. 18,818, 18,820 (1979). Moreover, in 1975 the Attorney General issued an opinion that a finding made in 1959 continued to authorize import adjustments by the President. He said that no new finding was necessary in 1975, even though there had been a "drastic change from the factual situation which provided the basis of the 1959 finding," and even though, shortly before he issued his opinion, the authority to make such a finding had been transferred from the Director of the Office of Emergency Planning to the Secretary of the Treasury, *see* Pub. L. No. 93-618, § 127(d), 88 Stat. 1993 (1975). 43 Op. Att'y Gen. No. 3 at p. 2 (1975). The Attorney General reasoned that the President's § 232(b) power to take "such action . . . as he deems necessary" to adjust imports is authority to take not just
Continued

clear that the President's power to "adjust" imports includes the power to impose an import quota. *See Federal Energy Administration* v. *Algonquin SNG, Inc.,* 426 U.S. 548, 561, 571 (1975).

We understand, however, that the President wishes to divert oil primarily to deal with the foreign policy consequences of an Iranian cutoff. It might be argued that it is inconsistent with Congress' intentions to use § 232(b) to deal with the foreign policy implications of imports. The language of the statute and its legislative history suggest that Congress expected § 232(b) to be used primarily to protect domestic industries or, more generally, to deal with the domestic consequences of imports. *See, e.g.,* § 232(c), 19 U.S.C. § 1862(c). It may be, however, that an Iranian oil cutoff would threaten instability in American domestic markets as well as in world markets, and that a reasonable method of preventing this instability would be to limit imports; in this way the cutoff might be justified as a measure to aid the domestic economy. We do not know whether the facts support this view. More fundamentally, however, while Congress clearly focused on the domestic effects of imports, it did not explicitly limit the President to considering only domestic effects. Instead, it used the term "national security," which ordinarily comprises matters of foreign policy. Congress did not attempt affirmatively to exclude this aspect of the normal meaning of "national security." Since Congress used the term "national security," we believe that the President has the authority to consider all the aspects of national security—including foreign policy—when he adjusts imports under § 232(b).

The practical problems may be more difficult to solve. Section 232(b) allows the President to "adjust . . . imports." It is difficult to construe this as authority to order the holders of oil to do a particular thing with the oil they cannot import. Consequently, § 232(b) does not give the President direct control over the oil diverted from the United States; it is subject to the vagaries of the market. This may be an inefficient, or even ineffective, way of supplying the needs of our allies.

a single measure but continuing course of action, "a continuing process of monitoring and modifying the import restrictions, as their limitations become apparent and their effects changed." *Id.* Courts enforced restrictions which the President imposed as late as 1968, even though the restrictions were based on the 1959 findings; the courts did not seem to doubt that those findings adequately supported the President's action. *See, e.g., Gulf Oil Corp.* v. *Hickel,* 435 F.2d 440 (D.C. Cir. 1970).

The Attorney General's opinion did not comment on the transfer of the function. It seems reasonable to conclude, however, that if the findings can survive the passage of 16 years and a "drastic change" in circumstances, they can also survive a transfer of functions within an administration. Indeed, earlier this year the President imposed a Gasoline Conservation Fee, *see* Pres. Proc. No. 4744, 45 Fed. Reg. 22,864 (1980), rescinded by Pres. Proc. No. 4766, 45 Fed. Reg. 41,899 (1980), partly on the authority of § 232(b) and the March, 1979, findings of the Secretary of the Treasury. For these reasons, we believe that the March, 1979, findings will support an import quota imposed by the President to deal with an Iranian oil cutoff. Of course, if circumstances and the applicable regulations, *see* § 232(d), 19 U.S.C. § 1862(d), permit, it may be more prudent to have the Secretary of Commerce make a new investigation and enter the finding appropriate to an import quota designed to respond to an Iranian oil cutoff.

## III. The International Energy Program

The Agreement on an International Energy Program, 27 U.S.T. 1685, Nov. 18, 1974, T.I.A.S. No. 8278, is designed to share the effects of oil shortages among the nations participating in the agreement. The United States and the allies who would be most affected by an Iranian oil cutoff are participants. Certain of the participants' obligations take effect if the total imports of all the participating nations fall more than 7 percent from the previous year, or if any one nation's available oil supplies fall more than 7 percent. Specifically, each participant is then obligated to reduce its demand for oil by 7 percent from the previous year and share its savings among the other participants. Under § 251(a) of the Energy Policy and Conservation Act, the President has the power to issue regulations "requir[ing] that persons engaged in producing, transporting, refining, distributing, or storing petroleum products, take such action as he determines to be necessary for implementation of the obligations of the United States under . . . the international energy program insofar as such obligations relate to the international allocation of petroleum products." 42 U.S.C. § 6271(a). We are advised that such regulations already exist. *See* 10 C.F.R. § 218.1–218.43.

We understand, however, that the United States has already reduced its consumption of oil by more than 7 percent from last year. If this is true, then even if other nations' oil supplies fell sharply, the United States would apparently have no further obligations under the Program, and § 251(a) would not grant the President authority to order redistributions of oil.[6] For this reason, the International Energy Program seems an unlikely source of authority for dealing with an Iranian oil cutoff.

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[6] Article 22 of the Agreement provides that:

> The Governing Board may at any time decide by unanimity to activate any appropriate emergency measures not provided for in this Agreement, if the situation so requires.

The Governing Board is composed of members from each participating country. Article 50, § 1. Measures adopted by the Board in this way may impose on the United States additional "obligations" within the meaning of § 251(a) of the Energy Policy and Conservation Act, although it might be argued that since the United States can veto such a measure, it cannot be said to impose an obligation.