Jeannette HAUSLER, Petitioner,

v.

JPMORGAN CHASE BANK, N.A., Citibank, N.A., UBS AG, The Royal Bank of Scotland, N.V., and Bank of America, N.A., Respondents.

No. 09 Civ. 10289 (VM).

United States District Court, S.D. New York.

Feb. 22, 2012.

---

Alfonso J. Perez, Rasco Reininger Perez & Esquenazi, Karen Oiivia-Marie Stewart, Roberto Martinez, Colson, Hicks & Eidson, Coral Gables, FL, Daniel Feist Schreck, Law Offices of G. Oliver Koppell & Assoc., James Wilson Perkins, Greenberg Traurig, LLP, New York, NY, for Petitioner.

James Loran Kerr, Lauren Brooke Schorr, Thomas Matthew Noone, Davis Polk & Wardwell L.L.P., James Wilson Perkins, Greenberg Traurig, LLP, New York, NY, for Respondents.

### DECISION AND ORDER

VICTOR MARRERO, District Judge.

Petitioner Jeannette Hausler ("Hausler" or "Petitioner") brings this action as the successor and personal representative of the Estate of Robert Otis Fuller ("Fuller") pursuant to § 201(a) of the Terrorism Risk Insurance Act of 2002 (the "TRIA"), 28 U.S.C. § 1610 note, to execute a default judgment entered by a Florida state court (the "Florida Judgment"). The Florida Judgment held the Republic of Cuba, Fidel and Raul Castro, and the Cuban Revolutionary Armed Services (collectively, the "Judgment Debtors") liable for the torture and extrajudicial killing of Fuller. To enforce the Florida Judgment in this Court, Hausler has brought several turnover petitions against JPMorgan Chase Bank, N.A., Citibank, N.A., UBS AG, The Royal Bank of Scotland, N.V. (f/k/a ABN AMRO Bank, N.V.), and Bank of America, N.A. (collectively, "Respondents" or "Garnishee Banks"). At issue here are two of those turnover petitions—Petitions I and III—in which Hausler seeks to execute upon accounts created and maintained by Respondents as repositories for sums blocked in the course of electronic fund transfers

("EFTs") involving the Judgment Debtors or their agencies or instrumentalities (the "Blocked Funds").

On September 13, 2010, the Court issued a Decision and Order, which found that the TRIA preempts state property law and renders assets frozen from blocked EFTs subject to attachment and execution. *See generally Hausler v. JP Morgan Chase Bank, N.A.*, 740 F.Supp.2d 525 (S.D.N.Y. 2010) (the "September 2010 Decision"). The September 2010 Decision also expressly endorsed the Respondents' use of interpleader to include in this action any other entities or individuals that might assert competing claims to the Blocked Funds. *Id.* at 541–42. Though familiarity with the September 2010 Decision is presumed, the Court will begin by briefly outlining the parties before it and the posture of this litigation.

## I. *BACKGROUND* [1]

### A. *PETITIONER*

The Florida Judgment, recognized by the United States District Court for the Southern District of Florida and given full faith and credit by this Court on September 26, 2008, arose from what the Florida Judgment held to be the extrajudicial killing and torture of Fuller by the Judgment Debtors in the aftermath of the Cuban revolution.

In this action, Hausler, acting on her own behalf and as representative of her deceased brother Fuller, seeks to enforce the Florida Judgment for compensatory damages by requesting the turnover of various assets held in the United States by the Garnishee Banks, financial institutions that are in possession of funds blocked or

frozen pursuant to the Cuban Asset Control Regulations (the "CACRs"), 31 C.F.R. Part 515, issued and administered by the United States Treasury Department's Office of Foreign Assets Control ("OFAC").[2]

### B. *GARNISHEE BANKS*

Each of the Garnishee Banks served as the intermediary for the EFTs described in Petitioner's turnover petitions. In the case of each EFT, the Garnishee Bank, in accordance with the CACRs and OFAC instructions, blocked the transmission of funds after determining that the Judgment Debtors or their agencies or instrumentalities were involved in the EFT at issue. Specifically, the Garnishee Banks blocked the EFTs after determining that certain Cuban banks were involved in the transactions. Those banks are Banco Nacional de Cuba, Banco Financiero Internacional, S.A., Banco Popular de Ahorro and Banco Internacional de Comercio S.A. (collectively, the "Cuban Banks"). Also in accordance with the CACRs, the Garnishee Banks placed the proceeds of the blocked EFTs into interest-bearing accounts, where the Blocked Funds remain to this day.

After being served with the turnover petitions aimed at these blocked EFTs, the Garnishee Banks argued that the TRIA did not permit the attachment and execution of blocked assets resulting from illegal EFTs because New York state law provides that originators and beneficiaries of EFTs do not own the subject funds while the funds are possessed by intermediary banks. The Court rejected this argument and found the Blocked Funds subject to

---

**1.** The sources from which the following factual summary is derived are listed in a note following the order portion' of this decision and order.

**2.** For a complete explication of the operation and applicability of the CACRs and the role of OFAC, see the September 2010 Decision at 527.

attachment and execution under the TRIA. *See* September 2010 Decision at 530–39.

In light of the Court's September 2010 Decision, and without any interest of their own in the Blocked Funds, the Garnishee Banks then filed interpleader actions under Rule 22 of the Federal Rules of Civil Procedure to inoculate themselves against potential liability that might arise should entities not already before the Court claim interest in the Blocked Funds. The Garnishee Banks undertook the interpleader proceedings in recognition of the Court's discussions of that procedure in the September 2010 Decision. *See* September 2010 Decision at 541–42. Respondents commenced the relevant interpleader actions (the "Interpleader Petitions") on April 21, 2010, as to Petition I, and October 29, 2010, as to Petition III.

## C. *ADVERSE CLAIMANT RESPON-DENTS*

Ultimately, several entities from various countries responded to the Interpleader Petitions and now assert claims to the Blocked Funds. Each respondent to the Interpleader Petitions alleges that it possesses an interest in the Blocked Funds that is superior to that of the Petitioner. As relevant to the motions now before the Court, the following parties responded to the Interpleader Petitions: Shanghai Pudong Development Bank Co., Ltd. ("SPDB"); Banco Bilbao Vizcaya Argentaria Panama, S.A. and Banco Bilbao Vizcaya Argentaria, S.A. (together, "BBVA"); Premuda S.p.A. ("Premuda"); Novafin Financiere, S.A. ("Novafin"); LTU Lufttransport–Unternehmen GmbH ("LTU"); Caja de Ahorros y Monte de Piedad de

Madrid ("Caja Madrid"); and Estudios Mercados y Suministros, S.L. and Philips Mexicana S.A. de C.V. ("Philips Mexicana/EMS"). These entities will be referred to collectively as the "Adverse Claimant Respondents" or "ACRs."

Each ACR presents factual circumstances which it asserts support its asserted interest in particular blocked funds. The ACRs also put forward legal arguments under New York law to support their claims to ownership of or superior interest in the funds in particular frozen accounts.

The factual patterns presented by the ACRs compose variations on a single theme: Each ACR argues that its own clerical mistakes caused the EFTs to be blocked. The facts presented by each ACR will be reviewed in brief.

On July 9, 2011, SPDB initiated an EFT, through Citibank in the United States, in which Bank of China was to be the beneficiary's bank and Eximbank was to be the ultimate beneficiary. According to SPDB's factual submissions, Citibank blocked this EFT because a non-required field in the supporting payment order contained a reference to Banco National de Cuba. Shortly after the transaction was blocked, SPDB notified Citibank that it believed the blocking was an error. Though SPDB has corresponded with Citibank regarding the status of the blocked funds, SPDB has never applied to OFAC for a license to unblock the funds.[3]

BBVA initiated three of the wire transfers at issue in the Petition III interpleader complaint. Each of these transactions

---

**3.** The CACRs explicitly provide procedures to unblock transactions that have been blocked as the result of a mistake. *See* 31 C.F.R. § 515.201(e) ("When a transaction results in the blocking of funds at a banking institution pursuant to this section and a party to the

transaction believes the funds have been blocked due to mistaken identity, that party may seek to have such funds unblocked pursuant to the administrative procedures set forth in § 501.806 of this chapter.").

involved Banco Financiero Internacional, S.A. ("BFI"), a Cuban bank. The first transaction, initiated in January 1996, sought to transfer funds into an account held at BFI by a Dutch company. Though BBVA agreed to execute this transfer through its Paris branch, instead, it routed the transfer through Bank of America, and stated that the beneficiary bank was BFI. Bank of America then froze the EFT pursuant to the CACRs. The second transaction, which occurred in September 2005, involved an attempted transfer from a BFI account held at BBVA's Paris branch to another BFI account held at BBVA's Panamanian branch. Rather than simply debiting and crediting those two accounts, however, BBVA routed an EFT through Citibank. The final BBVA transaction involved a similar situation: In January 2004, Banco Internacional de Comercio S.A., another Cuban bank, sought to transfer money from a BBVA Paris account to a BBVA Panama account. Instead, BBVA Paris routed the funds through Citibank in New York, where the funds were frozen pursuant to the CACRs. Since each of these transactions was blocked, BBVA has communicated with personnel at Bank of American and Citibank regarding the status of the frozen accounts. There is no indication that BBVA has ever sought an OFAC license to unblock the frozen funds in which it now asserts an interest.

On or about March 7, 2007, Permuda initiated a transfer described in the Petition III Interpleader Petition, in which it requested that Citibank transfer funds to an account at BFI held by a Cuban ship management company. Citibank blocked these funds pursuant to the CACRs. Subsequently, Permuda filed with OFAC a request for a license to unblock the funds, which OFAC denied.

On November 21, 2006, Novafin initiated an EFT to Banco Internacional de Comer-cio S.A. ("BICSA"), a Cuban bank. Though BICSA asked that the transfer be made in Euros—and therefore routed through Europe rather than the United States—Novafin mistakenly transferred U.S. dollars, and therefore the EFT was routed through Citibank in the United States. Citibank, accordingly, blocked the transfer pursuant to the CACRs. In 2006, 2007 and 2008, Novafin applied to OFAC for a license to unblock these frozen funds. Novafin has provided no information regarding the status of these applications; apparently, OFAC has declined to unblock these funds.

LTU also initiated a transfer described in the Petition III Interpleader Petition. That transaction was blocked on or about October 26, 2005 because the beneficiary listed was BICSA. LTU contends that BICSA was not the intended beneficiary and that its designation as such was a data-entry mistake. There is no evidence that LTU has sought an OFAC unblocking license at any point.

Caja Madrid initiated two wire transfers described in the Petition III Interpleader Petition, one on August 25, 2000 and another on May 22, 2002, Each of those transactions was initiated in response to a request from Caja Madrid's client, Banco Polular de Ahorro de la Habana, to transfer deposits from one Caja Madrid account to another Caja Madrid account, with both accounts located in Spain. In both instances, clerks at Caja Madrid mistakenly created international payment orders rather than executing internal transfers. When those international payment orders were routed through Citibank in the United States, the transfers were frozen pursuant to the CACRs. Caja Madrid promptly notified Citibank of the mistaken transactions and Citibank responded by informing Caja Madrid that the only way to unblock

the funds was through OFAC's licensing procedures.

On April 7, 2004, Philips Mexicana initiated an EFT to pay Adverse. Claimant Respondent EMS for installation services related to certain medical equipment to be shipped from the Netherlands. EMS was the beneficiary and its bank, BICSA, was to ultimately receive the payment. Though Philips Mexicana intended to route the payment through a Mexican bank, its treasurer mistakenly routed the EFT through Bank of America in New York. Bank of America, recognizing that BICSA was a Cuban entity, blocked the EFT. There is no evidence suggesting that Philips Mexicana or EMS have sought any license from OFAC.

To summarize: Each of the ACRs has presented undisputed facts indicating that the Blocked Funds were frozen only because of its own inadvertence and mistaken paperwork.

### D. *THE INSTANT MOTIONS*

Now before the Court are various motions filed in the wake of the Garnishee Banks' complaints in interpleader. Petitioner moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) or summary judgment pursuant to Federal Rule of Civil Procedure 56 ("Rule 56"), and seeks turnover orders related to the Blocked Funds targeted in Petitions I and III. (Docket Nos. 264, 268.) Adverse Claimant Respondent SPDB opposes Petitioner's motion for judgment on the pleadings or summary

judgment in regard to Petition I, and moves for summary judgment denying Petitioner's application for the turnover of the Blocked Funds at issue in Petition I. (Docket No. 342.) The other ACRs oppose Petitioner's motion for judgment on the pleadings or summary judgment as to Petition III, and seek summary judgment denying Petitioner's request for turnover as to the Blocked Funds at issue in that Petition. (Docket Nos. 309, 313, 320, 325, 328, 330, 340.)

In her motions for judgment on the pleadings, Petitioner argues that the ACRs are not proper parties in this litigation and that the ACRs' motions for summary judgment must therefore be ignored. Though the ACRs argue that they were properly interpled by the Garnishee Banks, the ACRs, in an abundance of caution, have also filed motions to intervene. (*See* Dockets No. 311, 319, 324, 336, 337, 354.)

Finally, Petitioner moves to strike the ACRs' Rule 56.1 Statements as improper and immaterial. (Docket No. 381.) Petitioner's motion to strike is based upon the argument that the ACRs are not parties to the turnover petitions.

■■■ Because the Court specifically anticipated and endorsed the intervention of the Adverse Claimant Respondents and the Garnishee Banks' use of interpleader, the Adverse Claimant Respondents' motions to intervene are GRANTED and Petitioner's motion to strike is DENIED.[4]

---

4. "Rooted in equity, interpleader is a handy tool to protect a stakeholder from multiple liability and the vexation of defending multiple claims to the same fund." *Washington Elec. Coop., Inc. v. Paterson, Walke & Pratt, P.C.*, 985 F.2d 677, 679 (2d Cir.1993). "[W]hat triggers interpleader is 'a real and reasonable fear of double liability or vexatious, conflicting claims.'" *Id. (quoting In-*

*dianapolis Colts v. Mayor of Baltimore*, 741 F.2d 954, 957 (7th Cir.1984), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1753, 84 L.Ed.2d 817 (1985)). As a remedial joinder device, interpleader is to be liberally construed. *See State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523, 533, 87 S.Ct. 1199, 18 L.Ed.2d 270 (1967); *6247 Atlas Corp. v. Marine Ins. Co.*, 155 F.R.D. 454, 461 (S.D.N.Y.1994) (stating that

In view of the facts presented in the various Rule 56.1 Statements and declarations and in consideration of the arguments set forth in the voluminous briefing before the Court, Petitioner's motions for summary judgment are GRANTED and the Adverse Claimant Respondents' motions for summary judgment are DENIED.

The grounds for the Court's ruling are set forth below. First, the Court will briefly reprise certain aspects of its reasoning, presented in depth in the September 2010 Decision, supporting the conclusion that the TRIA preempts state property law, including a discussion of relevant subsequent decisions. Next, the Court will answer the substantive question at issue here, namely, whether, under the TRIA and related statutes, any of the ACRs have presented claims to the Blocked Funds superior to that of Petitioner. Finally, the Court will briefly dispose of the ACRs' backstop constitutional arguments.

## II. TRIA PREEMPTS STATE PROPERTY LAW

### A. THE SEPTEMBER 2010 DECISION

The Court will not exhaustively recapitulate its reasoning in support of the conclusion that TRIA preempts state property law and, therefore, that the Blocked Funds are available for attachment and execution under the TRIA. Suffice it to say that, in light of the Adverse Claimant Respondents' arguments and the recent case law they cite in support of their claims, the Court has closely reexamined its September 2010 Decision regarding this issue and remains persuaded that its prior ruling should be reaffirmed. The central issue presented by the instant motions is whether Petitioner is entitled to the turnover of the Blocked Funds. However, a few points regarding preemption do bear repeating.

First, the Court held that the TRIA preempts state property law because, when read in conjunction with the CACRs, the TRIA defines the range of Cuban property interests in assets frozen in the United States that constitute "blocked assets of [a] terrorist party." The CACRs broadly define the range of Cuban property interests subject to being blocked under OFAC's direction, and the TRIA expressly makes those blocked assets available for attachment and execution to satisfy certain judgments. *See* September 2010 Decision at 532. Indeed, the Second Circuit has recognized, albeit in dicta, that the "plain

---

both rule and statutory interpleader should be liberally construed). As such, and as courts have done in numerous similar cases, the Court has permitted the Garnishee Banks to use interpleader to resolve any potential competing claims to the Blocked Funds in this litigation. *See* September 2010 Decision at 541–42. For other examples of the use of interpleader petitions in cases involving the execution of judgments under the TRIA, *see e.g. Levin v. Bank of New York*, 09 Civ. 5 900, 2011 WL 812032, at *2 (S.D.N.Y. Mar. 04, 2011); *Weininger v. Castro*, 462 F.Supp.2d 457, 500 (S.D.N.Y.2006).

Because the use of interpleader is appropriate, the interests advanced by the ACRs are properly before the Court. The Court's re-

view of the ACRs' supporting factual submissions is therefore material to the resolution of the competing claims to the Blocked Funds. As such, Petitioner's motion to strike those factual submissions, under Federal Rule of Civil Procedure 12(f), must be denied. *See Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 894 (2d Cir.1976) ("Rule 12(f) should be construed strictly against striking portions of the pleadings on the grounds of immateriality ...."). Additionally, because consideration of the materials targeted by Petitioner's motion to strike actually permits the Court to reach a determination on Petitioner's motion for summary judgment, which turns out favorable to her, it is clear that Petitioner can complain of no prejudice.

language" of the TRIA provides for execution upon "assets that would otherwise be blocked" under OFAC regulations. *Smith ex rel. Estate of Smith v. Federal Res. Bank of N.Y.*, 346 F.3d 264, 270–71 (2d Cir.2003).

■ Moreover, the CACRs are not merely regulations made relevant by reference in the TRIA; the CACRs are themselves an integral part of the statutory context in which the language of the TRIA must be understood. In 1996, Congress codified the CACRs into federal law, requiring that the executive branch "enforce fully the Cuban Assets Control Regulations set forth in part 515 of title 31, Code of Federal Regulations." 22 U.S.C. § 6032(c); *see also Empresa Cubana del Tabaco v. Culbro Corp.*, 399 F.3d 462, 465 (2d Cir.2005) ("In 1996 Congress codified the Regulations in the Cuban Liberty and Democratic Solidarity Act of 1996.").[5] Thus, a court interpreting the TRIA must do so in a manner that harmonizes that statute with the CACRs.

■ Second, the statutory purposes of the TRIA cast it in stark contrast to those federal statutory provisions dealing with the attachment and execution of assets that have been found not to preempt state property law. *See* September 2010 Decision at 536. The TRIA is the product of a Congressional effort to "deal *comprehensively* with the problem of enforcement of judgments rendered on behalf of victims of terrorism." *Id.* at 531 (citing H.R. Conf. Rep. No. 107–779 at 27, 2002 U.S.C.C.A.N. 1430, 1434 (emphasis added)). Though Congress contemplated the use of state procedural law to enforce judgments, *id.* at

527, the TRIA represents Congress's recognition that federal law must provide the substantive rules governing the recovery of terrorism-related judgments, *id.* at 536–37. Additionally, Congress's purpose in enacting the TRIA was to address foreign policy goals such as deterring acts of terrorism and restricting the economic activity of terrorist parties. *Id.* at 537. In essence, the TRIA, as supplemented by the CACRs and the OFAC procedures, represents Congress's policy determination that under some circumstances, such as those prevailing here, in a choice between a claim to assets asserted by a victim of an act of a terrorist state and embodied in a judgment interest obtained under federal law, and a claim of an interest in the same assets arising from a commercial transaction and asserted under state law, the federal interest is superior and must be given priority in any court dispute over release of the assets.

Third, and relatedly, the use of state property law to dictate the range of assets that are executable under the TRIA would generate absurd results. If the TRIA does not preempt state law, the application of state law in proceedings to enforce judgments obtained pursuant to the TRIA could lead to divergent outcomes depending on the fortuity of which state happened to be the physical site of the blocking of electronic transfers. Even worse, the availability of blocked assets for execution under the TRIA could be manipulated by intermediary banks such as Respondents, who appear unconstrained in determining where to locate the accounts created when they block an EFT pursuant to the

---

**5.** It is worth noting that the CACRs expressly invoke and incorporate state law in certain circumstances, suggesting that the regulations are meant to supersede state law where they do not directly integrate it. The CACRs permit state agencies to petition for licenses to unblock and confiscate assets where the relevant state laws regarding abandoned property satisfy certain conditions. *See* 31 C.F.R. § 515.554 ("Transfers of abandoned property under State laws.").

CACRs and, therefore, could prevent assets from turnover under the TRIA simply by placing such accounts in states with favorable property law. Such results are inconsistent with the creation of this otherwise wholly-federal scheme designed to advance a foreign policy goal. *See Propper v. Clark*, 337 U.S. 472, 485, 69 S.Ct. 1333, 93 L.Ed. 1480 (1949) ("The Trading with the Enemy Act is national in range. The effect of a federal freezing order should be the same on subsequent transfers of title in all states.")

Fourth, the Court observed yet another pertinent consequence were it to find that state property law governs the disposition of the Blocked Funds under the TRIA. According to Respondents and the ACRs, state law prevents execution against the Blocked Funds under the TRIA, yet no party challenges the propriety of blocking the funds under the CACRs. Therefore, the application of state property law here would lead to the Blocked Funds remaining as such until unforeseen future events might allow the return of the funds to Cuba, its agencies, instrumentalities or business creditors. *See* 22 U.S.C. § 6064 (establishing conditions for termination of Cuban embargo administered through CACRs). Such an outcome cannot be mandated by the TRIA because it would frustrate its core objective, to satisfy judgments held by victims of Cuban terrorism, and would stymie Congress's broader purpose in permitting suits against state sponsors of terrorism by diminishing the costs of doing business with known terrorist states or their agents and instrumentalities.

In fact, some of the Adverse Claimant Respondents did avail themselves of the CACRs' procedures by filing applications for licenses with OFAC, some of which were denied outright. Thus, failing to persuade OFAC of the merits of their claimed interest in the Blocked Funds—presumably with the same arguments they make here—the funds remain in Respondents' control, as there is no indication on the record that the ACRs took any other administrative or judicial appeal from OFAC's rulings. By seeking summary judgment in these proceedings based on essentially the same factual presentation that failed to persuade OFAC, the ACRs would achieve an end-run around the CACRs and OFAC if the Court ruled in their favor; they would obtain from this Court the relief which OFAC denied them and which they did not challenge further in the CACRs process or judicial review thereof.

With this partial review of the September 2010 Decision in mind, it is now appropriate to turn to an examination of three relevant opinions handed down by federal courts in the last fifteen months.

## B. SUBSEQUENT RELEVANT DECISIONS

Since the Court issued the September 2010 Decision, two other decisions in this district have considered whether state property law defines what "blocked assets of [a] terrorist party" are subject to attachment and execution under the TRIA: *Levin v. Bank of New York*, 09 Civ. 5900, 2011 WL 812032 (S.D.N.Y. Mar. 04, 2011) and *Calderon–Cardona v. JPMorgan Chase Bank, N.A.*, 11 Civ. 3283, —— F.Supp.2d ——, 2011 WL 6155987 (S.D.N.Y. Dec. 7, 2011). Additionally, the United States Supreme Court, in *Board of Trustees of the Leland Stanford Junior University v. Roche Molecular Systems, Inc.*, —— U.S. ——, 131 S.Ct. 2188, 180 L.Ed.2d 1 (2011) ("*Stanford*"), confronted the relevant issue of whether the word "of" should be read to connote ownership in the context of a statutory provision governing patent rights. A corollary issue emerging

from *Stanford* and argued by the parties here is whether the Supreme Court's interpretation of the word "of" in *Stanford* extends more widely to define the meaning of that word as employed universally or more specifically to other statutory schemes.

### 1. *Levin*

*Levin* dealt with a TRIA petition to attach and execute against blocked EFTs to satisfy an underlying judgment against the Islamic Republic of Iran ("Iran"). *Levin*, 2011 WL 812032, at *1. In reviewing the text and purposes of the TRIA, the *Levin* Court concluded that "[i]t is plainly the intention of [the] TRIA ... to make blocked assets available to plaintiffs." *Id.* at *18. *Levin* agreed with this Court's conclusion that the TRIA preempted state law because the "TRIA's definition of 'blocked assets' defines which assets are subject to attachment by reference to the regulations pursuant to which the assets are blocked, and it is this definition that dictates what interest in property subjects a judgment debtor's property to attachment." *Id.* at *17. Therefore, *Levin* looked to the regulations promulgated to block assets related to Iran and found that, under those regulations, EFTs were subject to blocking, attachment and execution. *Id.* The *Levin* Court's approach to interpreting the TRIA tracked closely with this Court's approach in the September 2010 Decision.

There is another noteworthy aspect of the *Levin* decision: *Levin* dealt extensively with the priority of interests held by various parties with judgments against Iran. The *Levin* petitioner, holding a judgment against a terrorist party, filed suit in the Southern District of New York to execute upon assets held in this district and blocked pursuant to OFAC regulations associated with Iran. *Id.* at *2. As in this case, the *Levin* respondent banks used interpleader petitions to bring before the court other entities with asserted interests in the blocked funds targeted for turnover, and several adverse claimants responded. Unlike this case, however, those adverse claimants were not foreign banks involved in the underlying EFTs, but rather other individuals who held judgments against Iran and who also sought to execute judgments under the TRIA.[6] *Id.* at *2.

In assessing the relative superiority of the claims to the blocked funds, the *Levin* Court looked to provisions of the TRIA and the related Foreign Sovereign Immunities Act ("FSIA"). *Id.* at *6–10. The *Levin* Court, therefore, employed federal law to determine which of the claimants held the superior interest in any given fund. In so doing, the *Levin* Court pointed to the FSIA House Report, which specifically disclaimed the attachment and execution standards of some states as being insufficient for purposes of executing judgments against foreign sovereigns. *Id.* at *7 (*quoting* H.R.Rep. No. 1487, 94th Cong., 2d Sess. 30, *reprinted in* 1976 U.S.Code Cong. & Admin. News 6604,

---

**6.** One international bank, Commerzbank, did respond to the interpleader petitions in *Levin*, asserting an interest in a frozen account as the beneficiary's bank in the underlying EFT. *See Levin v. Bank of N.Y.*, 09 Civ. 5900, Answer of Third Party Defendant Commerzbank AG to the Interpleader Complaint of Société Générale, at 3 (Apr. 20, 2010) (Docket No. 156). However, Commerzbank later withdrew its claim to the blocked fund. *See Levin*

*v. Bank of N.Y.*, 09 Civ. 5900, Stipulation of Dismissal of Interpleader Action and Crossclaim Against Commerzbank AG with Prejudice, at 2 (July 26, 2010) (Docket No. 235). As such, the *Levin* decision does not address the level of priority of Commerzbank's asserted interest in the blocked fund relative to the interests of the judgment creditors. *Levin*, 2011 WL 812032, at *4.

6629.). Moreover, because Congress codified the TRIA as a note to the FSIA, the former "must be read in the context of the overarching statutory scheme of the FSIA." *Id.* at *10.

In sum, the *Levin* Court found that the TRIA preempts state law because "[t]he language of [the] TRIA is broad, subjecting *any asset* to execution that is seized or frozen pursuant to the applicable sanctions schemes." *Id.* at *16. Moving on to determine whether any interest in the blocked EFTs existed superior to that of the petitioning judgment debtor, *Levin* looked to the federal statutory scheme in which the TRIA is enmeshed, not to any ownership interests asserted by non-judgment holders under any other body of law.

### 2. *Calderon–Cardona*

On December 7, 2011, in an action seeking to enforce a judgment against the People's Republic of Korea ("North Korea") by executing upon blocked EFTs, another court in this district had occasion to assess whether the TRIA preempts state law for purposes of defining "blocked assets of [a] terrorist party." The *Calderon–Cardona* Court denied the petitioner's motion for turnover because North Korea was not a "terrorist party" as defined in the statute. *Calderon–Cardona,* —— F.Supp.2d at ——–——, 2011 WL 6155987, at *3–8.

The *Calderon–Cardona* Court went on, in the alternative, to consider the preemption question addressed in the September 2010 Decision and *Levin*. The *Calderon–Cardona* Court found that the TRIA did not preempt state property law and that the phrase, "blocked assets of [a] terrorist party," restricted the application of the TRIA to only those assets owned by a terrorist party under state-law definitions of ownership. *Id.* at ——, at *12. The Court rested this conclusion on its finding that the word "of" indicated ownership,

and that ownership could be determined only by recourse to state property law. *Id.* at ——–——, at *8–9.

The *Calderon–Cardona* Court parsed the phrase "blocked assets of that terrorist party" into two components: "blocked assets" and "of that terrorist party." *Id.* at ——, at *8. As to the former, there was no doubt that the underlying EFTs at issue had been blocked pursuant to OFAC regulations regarding North Korea.

As to the later, the Court found that the word "of" indicated that the terrorist party had to have actual ownership of the blocked assets; since the TRIA and accompanying regulations did not define "ownership," the determination of whether the subject accounts were eligible for attachment and execution hinged on state property law. *Id.* at ——–——, at *8–9. The principal critique presented in *Calderon–Cardona* against the use of the CACRs (or similar OFAC regulations as to other nations) to interpret the TRIA as preempting state law is that such regulations operate only to supply content to the phrase "blocked assets," and provide no definition to the phrase, "of that terrorist party." *Id.* at ——, at *12. According to the *Calderon–Cardona* Court, then, a finding of preemption based on the definition of "blocked assets" in OFAC regulations "effectively reads the phrase 'of that terrorist party' out of the statute." *Id.* at ——, at *13.

This argument, however, overlooks a very basic aspect of the TRIA: The statute is not directed at a single terrorist entity and does not relate to a single set of blocking regulations. The TRIA expressly defines "[t]he term 'blocked asset' [to] mean[ ] . . . any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C.App. 5(b)) or under sections 202 and 203 of the International Emergency Eco-

nomic Powers Act ...." Terrorism Risk Insurance Act, Pub. L. 107–297, Title II, § 201(d)(2), 116 Stat. 2337 (2002). The phrase "of that terrorist party" provides the necessary, though perhaps perfunctory, instruction that the "blocked assets" available for execution are only those assets blocked pursuant to the particular regulation or administrative action directed at the particular terrorist-party judgment debtor. In other words, the TRIA does not permit a party with a judgment against Iran to execute against funds blocked pursuant to the CACRs, regulations which are, of course, targeted at Cuba.

The pivotal analytical step in the *Calderon–Cardona* opinion was the determination that the word "of" required that the noun referred to as the terrorist party after "of" legally own the assets referred to as the noun before "of."[7] *Id.* at ——, ——, at *8, *14 ("According to the Supreme Court, the word 'of denotes ownership'. There is no relevant body of federal law under which petitioners can claim ownership of blocked EFTs."). The authority for that proposition was the Supreme Court's recent *Stanford* decision.

### 3. *Stanford*

On June 6, 2011, the Supreme Court rendered its decision in *Stanford.* The *Stanford* opinion interpreted the phrase "invention of the contractor" within a provision of the Bayh–Doyle Act that deals with ownership of patents which cover inventions created in the course of federally-funded research. *Id.* at 2196. The Court found that the phrase referred only to inventions owned by the contractor after assignment from the inventor, and not to all inventions created by employees of the contractor in the course of a federally-funded project. *Id.* at 2196–99.

The Court's conclusion was based on several characteristics of the patent statutes at issue there that are materially absent in the TRIA and related statutes.

First and foremost, the Court found that the rejected interpretation would render the phrase "of the contractor" a nullity because that phrase would serve only to limit "invention" to those conceived during federally-funded research, a limitation already imparted by other language in the statute. *Id.* at 2196. Indeed, the Court began its analysis by contrasting the provision at issue with language elsewhere in the patent statutes that expressly divests an inventor of ownership of a patent. *Id.* at 2195. "Such language is notably absent" from the provision at issue in *Stanford,* and a finding that ownership was transferred implicitly would have been irreconcilable with related provisions permitting a contractor to "elect to retain title to" inventions it first conceived of or reduced to practice. *Id.* at 2196.

Moreover, the Court refused to infer, from the phrase "invention of the contractor," the removal of inventors' ownership rights in contravention of "two centuries of patent law." *Id.* Though the ACRs argue, by analogy, that the TRIA should not be interpreted to preempt long-standing state definitions of property ownership employed in the execution of judgments, the comparison is misplaced. In *Stanford,* the

---

7. Examples of alternative definitions of "of" are so numerous that it seems a court of law need not enumerate them. To provide a measure of completeness, however, this footnote, excluding the following citation and parenthetical thereto, contains six examples of uses of the word that indicate relationships other than those of formal ownership. *See also Stanford,* 131 S.Ct. at 2196 (describing use of "of" to define ownership as "a common definition" and describing alternative interpretation of statutory phrase as "plausible" in different statutory context).

Court was dealing with a federal statutory provision in the context of centuries of federal statutory patent law. Therefore, the Court read the provision before it in a manner consistent with that body of law.

To view the TRIA in the expansive Anglo–American history of the execution of judgments and ignore the more relevant and recent federal statutory context regarding judgments against foreign and terrorist entities—as the ACRs would have the Court do—would be to misconstrue the purposes of the statute. In any event, such an approach is inconsistent with the Supreme Court's focus on the pertinent federal statutory context in *Stanford*. The TRIA's preemption of state law is simply not a "sea change" accomplished through an "idiosyncratic" and "oblique[ ]" interpretation of the statute at issue. *Id.* at 2199. Rather, the TRIA's preemption of state law represents a purposeful and incremental step Congress took building upon very recent enactments to which the TRIA is expressly connected. Though a finding of preemption may employ a plausible alternate meaning of the word "of"— one among numerous other definitions given to the term in any English dictionary— than that employed in *Stanford*, such a

conclusion is by no means contrary to the reasoning set forth in that decision.

## III. PETITIONER'S RIGHT TO EXECUTE ON BLOCKED FUNDS

### A. INTRODUCTION AND STANDARD OF REVIEW

In its September 2010 Decision, the Court authorized the Interpleader Petitions at issue to "provide ample additional opportunity for the assertion of any superior claims"[8] by "any interested third party [ ] not yet ... on notice of the blocked EFTs."[9] September 2010 Decision at 541.

The Petitioner and ACRs have cross-moved for summary judgment;[10] each motion presents essentially the same related questions: (1) Does Petitioner hold a superior interest in the Blocked Funds? And, (2) is Petitioner entitled to execute upon those Blocked Funds?

To prevail on a motion for summary judgment, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving

8. New York procedural law, which governs proceedings seeking to execute upon money judgments through Federal Rule of Civil Procedure 69, requires Petitioner to proceed against the Garnishee Banks and permits "other claimants to the ... money ... to intervene," if they have not been joined or interpleaded, to allow the Court to weigh all interests asserted in the subject property. *Koehler v. Bank of Bermuda Ltd.*, 12 N.Y.3d 533, 883 N.Y.S.2d 763, 911 N.E.2d 825, 828 (2009) (internal citation omitted). This state procedure is aimed at creating "a full-fledged test of precisely [to] whom the disputed property or debt belongs." *Id.* (internal citation omitted).

9. None of the Adverse Claimant Respondents contest that they were on notice of the Blocked Funds; indeed, many of the ACRs

tout their periodic communications with the Garnishee Banks regarding the Blocked Funds as evidence of their superior claims to those funds.

10. Petitioner styles her motions as seeking "judgment in her favor: (1) pursuant to Fed. R.Civ.P. 12(c) on the pleadings ... [and] (2) granting turnover pursuant to Fed. Rules Civ. P. 56 and 69 and CPLR 5225(b) [and (c)] of the funds in the blocked accounts that are the subject of this proceeding[.]" Petitioner's Notices of Motion (Docket Nos. 264 and 268.) Because the motions before the Court cannot be disposed of by recourse to the pleadings alone, but rather are dictated by the import of undisputed facts, the Court applies the summary judgment standard of Federal Rule of Civil Procedure 56 as set forth herein.

party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The movant bears the burden to demonstrate that there is no genuine issue of material fact. *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir.2010) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), When the moving party has met this initial burden, the opposing party must set forth specific facts showing that there is a genuine issue for trial, and cannot rest on mere allegations or denials of the facts asserted by the movant. *Davis v. New York*, 316 F.3d 93, 100 (2d Cir.2002) (citations omitted). The Court must "view the evidence in the light most favorable to the non-moving party, and may grant summary judgment only when no reasonable trier of fact could find in favor of the non-moving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir.1995) (citation omitted).

Because the Court finds that there is no genuine dispute as to any material fact regarding the relative priorities of the interests in the Blocked Funds asserted by the parties and that Petitioner is entitled to execute upon the Blocked Funds under the TRIA as a matter of law. Petitioner's motions are GRANTED, and those of the ACRs are DENIED.

## B. *PRIORITY OF INTEREST*

The substantive standard to determine whether a TRIA petitioner's interest in frozen assets mandates an order of turnover is supplied by the TRIA and related federal statutes. *See, e.g., Smith ex rel. Estate of Smith*, 346 F.3d at 271 n. 6 (finding that TRIA does not guarantee blocked funds will be available for judgment and mentioning unblocking, confiscation or claims of other victims, as reasons blocked funds may not be available for terrorist judgment creditors suing under TRIA); *Levin*, 2011 WL 812032, at *6–10

(evaluating claims of priority of interest in frozen assets by examining various claimants' satisfaction of procedural requirements set forth in FSIA), The task before the Court, then, is to determine whether the ACRs have presented an interest in the Blocked Funds, cognizable under the applicable federal statutory framework, which is superior to that of Petitioner. In view of the applicable federal statutes, the Court has little difficulty finding that Petitioner holds the superior interest in the Blocked Funds.

The Second Circuit has held that "the plain meaning of" the TRIA "is to give terrorist victims who actually receive favorable judgments a right to execute against assets that would otherwise be blocked." *Smith ex rel. Smith*, 346 F.3d at 271. The legislative history of the TRIA reinforces this plain-meaning interpretation. According to the House Conference Report, Congress's intent was to "establish that such judgments [against terrorist states] are to be enforced ... [and] are enforceable against any assets or property" referenced by the TRIA. H.R. Conf. Rep. No. 107–779 (2002), 2002 U.S.C.C.A.N. 1430, 1434. Thus, any evaluation under the TRIA of the priority of interests in the Blocked Funds must begin with the understanding that "terrorist victims" holding judgments, as a group, must be first in line.

In some instances—as in *Levin*—there may be multiple holders of judgments against terrorist entities. Under such circumstances, the federal statute to which the TRIA was appended as a note, the FSIA, requires that judgment holders obtain writs of execution. 28 U.S.C. § 1610(c). The order in which judgment holders obtain such writs is then an appropriate determinant of the order of priority among terrorist judgment holders. *See, e.g., Levin*, 2011 WL 812032, at *6–8.

Here, however, no competing judgment holders have asserted claims to the Blocked Funds.

The TRIA and the analysis in *Levin* dictate a focus on determining how to distribute blocked assets to terrorist judgment holders. This focus would seem to ignore parties, like the ACRs here, who do not hold terrorism-related judgments, but assert property interests in blocked assets arising from the commercial transactions underlying the Blocked Funds and their business relationships with the agencies or instrumentalities of a terrorist state.[11] That the statutory scheme here apparently ignores the interests of those parties in assessing the priority of interests in blocked assets, though, is appropriate for two reasons.

First, commercial parties who assert ownership interests in blocked assets have other avenues of redress. Again, the CACRs provide specific mechanisms through which parties like the ACRs may seek to unblock assets or obtain licenses to use blocked assets in accordance with whatever rights they may establish in those assets. If such parties dispute OFAC decisions, they may seek judicial review. *See, e.g., Zarmach Oil Services v. U.S. Dep't of the Treasury*, 750 F.Supp.2d 150 (D.D.C.2010) (reviewing OFAC decision denying license to unblock funds). Such parties need not, therefore, seek to vindicate their asserted property interests

by intervening in execution proceedings. Congress drafted the TRIA against the backdrop of statutory and regulatory provisions, including the CACRs, which require licenses to unblock; this restriction suggests that the TRIA should be read in consideration of these alternative opportunities for parties without terrorism-related judgments to assert interests in blocked assets. *See* September 2010 Decision at 532–33 (noting that "when drafting TRIA, Congress was presumably aware of ... OFAC regulations").

Second, it cannot be overlooked that nearly every ACR has expressly admitted to doing business with the agencies or instrumentalities of a designated terrorist state. By and large, the ACRs' purposes in engaging in the EFTs at issue here were to transmit money to, from or through Cuban government entities. The TRIA is part of a statutory framework created to inhibit business with specified terrorist states like Cuba; an ordering of interests that assigns lower priority to those asserted by Cuba's business partners is consonant with that purpose. The TRIA facilitates the recovery on judgments held by victims of international terrorism; concomitantly, the statutes upon which the TRIA is built are aimed at inhibiting international transactions with terrorist entities, their agencies or instrumentalities through United States financial institutions. On a fundamental level, then,

---

**11.** This conclusion is buttressed by the inclusion in the TRIA of a provision added to the Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106–386, 114 Stat. 1464 (2000), as amended by section 686 of Public Law 107–228, which expressly authorized the Secretary of the Treasury to promulgate guidelines for the distribution of account balances and proceeds in satisfaction of judgments held against Iran. *See* Terrorism Risk Insurance Act § 201(d). The inclusion of this provision, authorizing the administrative division of the relatively scarce available

funds associated with Iran, further demonstrates that, under the TRIA, the focus is upon determining the relative priority of judgment holders, not protecting the more general, unperfected interests of commercial parties to blocked transactions. *See also* H.R. Conf. Rep. No. 107–779, 2002 U.S.C.C.A.N. 1430, 1434 ("Unfortunately, several victims and families of victims who brought suit against Iran, were left out of the 2000 Act. The Conferees have sought to correct this injustice.").

it would undermine those purposes if, in United States court judgment execution proceedings, foreign banks doing business with the instrumentalities of a terrorist state were found to have a superior interest in the frozen assets as compared to that of a holder of a judgment against that very terrorist state. The Court has been presented with no compelling reason to arrive at such a distortion of Congressional intent articulated in a comprehensive and carefully calibrated statutory scheme.

■ There is no dispute as to the facts presented in the declarations and Rule 56.1 Statements of the ACRs. The ACRs' interests in the Blocked Funds are based on the circumstances of the underlying EFTs and their own mistaken routing of those EFTs through the United States. Because Petitioner is the holder of a judgment eligible for execution under the TRIA, the Court finds, as a matter of law, that the Petitioner's interest in the Blocked Funds is superior to the interests of the ACRs.

## C. *PETITIONER'S RIGHT TO EXECUTE ON BLOCKED FUNDS*

The ACRs challenge Petitioner's right to execute the Florida Judgment against the Blocked Funds by asserting that Petitioner has failed to establish that there is no genuine issue of material fact regarding the status of the Cuban Banks as "agencies or instrumentalities" of Cuba. The TRIA permits execution upon only the "the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party)." 28 U.S.C. § 1610 note, § 201(a). If the Cuban Banks are not agencies or instrumentalities of Cuba, then the Blocked Funds are beyond the reach of the TRIA.

Petitioner has carried her burden to show that there is no genuine issue of material fact as to the Cuban Banks' status as agencies or instrumentalities of Cuba for two independent and sufficient reasons: First, the Cuban Banks have, by their default in this action, admitted to that status. Second, Petitioner has submitted expert affidavits supporting the conclusion that the Cuban Banks are, in fact, agencies or instrumentalities of Cuba; the ACRs have failed to offer any evidence whatsoever to contest or contradict Petitioner's submissions.

### 1. *The Cuban Banks' Default*

■ The Cuban Banks have, by defaulting on the turnover petitioners in this action, admitted to being "agencies or instrumentalities" of Cuba. The turnover petitions filed by Hausler alleged that each Cuban Bank was an agency or instrumentality of Cuba and that the Blocked Funds are assets of agencies or instrumentalities of Cuba. (See, e.g., Petition III for Turnover Order Pursuant to Fed.R.Civ.P. Rule 69 and C.P.L.R. § 5225(b), at 8, July 7, 2010 (Docket No. 31).) The Cuban Banks failed to appear in this interpleader litigation or to dispute that fact, and, as a result, have admitted that "agencies or instrumentalities of Cuba [ ] have an interest in the" Blocked Funds. See Cotton v. Slone, 4 F.3d 176, 181 (2d Cir.1993); Weininger, 462 F.Supp.2d at 495–96, The Court accepts that factual allegation as true insofar as the parties against whom the allegation was levied—the Cuban Banks—have failed to contest it and no party to the pleadings in which that allegation was made—the turnover petitions—has contested it.

### 2. *Proffered Evidence of "Agency or Instrumentality"*

Notwithstanding the Cuban Banks' default and consequential admission of their status as agencies or instrumentalities, the

ACRs assert that they are independently entitled to dispute Petitioner's allegation of that status. Even assuming that the ACRs may contest factual allegations in a pleading to which they are not a party and to which the subjects of those allegations have themselves conceded, the ACRs have failed to raise a material issue of fact regarding the Cuban Banks' status.

The FSIA defines "agency or instrumentality" as any entity that (1) is "a separate legal person, corporate or otherwise," (2) is "an organ of a foreign state" or "whose shares or other ownership interest is owned by a foreign state," and (3) is "neither a citizen of a State of the United States ... nor created under the laws of any third country." 28 U.S.C. § 1603(b)(1)-(3). The ACRs do not contest that the Cuban Banks satisfy the first and third requirements, and instead assert only that the Petitioner has failed to demonstrate that the Cuban Banks are "organs" of Cuba.

■ The Second Circuit has set forth a balancing analysis to be used in determining whether an entity is an "organ of a foreign state."

> Although there is no specific test for "organ" status under the FSIA, various factors are relevant: (1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in

the [foreign] country; and (5) how the entity is treated under foreign state law.

*Filler v. Hanvit Bank*, 378 F.3d 213, 217 (2d Cir.2004); *see also European Cmty. v. RJR Nabisco, Inc.*, 814 F.Supp.2d 189, 202 (E.D.N.Y.2011) (*"Filler* invites district courts to engage in a balancing process, without particular emphasis on any given factor and without requiring that every' factor weigh in favor of, or against, the entity[.]") (internal citations and quotations omitted). As this Court has previously stated, "[i]n assessing whether these entities are agencies or instrumentalities of Cuba, the Court is 'mindful that the instrumentality and its related government—not the plaintiff—will frequently possess most of the information needed ... and it may be difficult for the plaintiff to obtain discovery from them.'" *Weininger*, 462 F.Supp.2d at 495 (*quoting Alejandre v. Telefonica Larga Distancia, de Puerto Rico, Inc.*, 183 F.3d 1277, at 1285 n. 19 (11th Cir.1999)). The Court must assess whether the Cuban Banks are "agencies or instrumentalities" of Cuba in light of the information that the parties have put before it on these motions for summary judgment. *See generally* Fed.R.Civ.P. 56(c). However, it is worth noting that neither the ACRs nor the Petitioner has access to the Cuban Banks' documents or information.

■ Instead, Petitioner has provided the expert testimony of Professor Jaime Suchlicki, the Director of the Institute for Cuban and Cuban–American Studies at the University of Miami.[12] This Court and

---

12. Under Rule 56, the non-movant may object to the consideration of "material cited to support ... a fact [that] cannot be presented in a form that would be admissible in evidence." Fed.R.Civ.P. 56(c)(2). Though the Suchlicki Affidavits themselves may or may not be admissible as evidence at trial, the expert opinions contained therein are certainly amenable to presentation in forms that would be admis-

sible. In short, the Court may consider and credit the Suchlicki Affidavits in the summary judgment context because this expert testimony would be admissible as such if Professor Suchlicki was called to testify in person.

Moreover, because *Filler* directs the Court to examine a foreign state's relationship with its putative agency or instrumentality, the

others have frequently reviewed and credited expert affidavits in concluding that entities are organs of foreign states in procedural circumstances similar to the instant motions. *See, e.g., Levin*, 2011 WL 812032, at *20–21; *Estate of Heiser v. Islamic Republic of Iran*, 807 F.Supp.2d 9, 17–20 (D.D.C.2011).

 Professor Suchlicki's opinion is presented in individual affidavits addressing each of the Cuban Banks (the "Suchlicki Affidavits"). The information presented in the Suchlicki Affidavits is based upon Professor Suchlicki's forty-year career as a leading expert on Cuba. The affidavits directly address several of the *Filler* considerations. The Suchlicki Affidavits detail, for example, the relationship between Cuba and the Cuban Banks, and how the Cuban Banks are state-owned corporations with executives who are chosen by and beholden to Cuba's political leadership. The Suchlicki Affidavits also describe how several of the Cuban Banks were created by specific Cuban laws and endowed with specific responsibilities and abilities by the Cuban government. The Suchlicki Affidavits also provide general information about how Cuban financial institutions typically work—a necessity given the fact that entities like the Cuban Banks are not transparent and refuse to litigate their status in courts of this country.[13]

In light of the evidence presented by the Suchlicki Affidavits supporting a finding that the Cuban Banks are organs of Cuba, the ACRs must counter evidence with evidence; they cannot "rel[y] upon conclusory statements or mere allegations ... to defeat a summary judgment motion." *Davis*, 316 F.3d at 100 (*citing Ying Jing Gan v. City of New York*, 996 F.2d 522, 532–33 (2d Cir.1993)). *See also* Fed.R.Civ.P. 56(c) ("A party asserting that a fact ... is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record ... or declarations ... or (B) showing that the materials cited do not establish the absence ... of a genuine dispute...."). Here, the ACRs merely decry the Suchlicki Affidavits as deficient and conclusory; they have not set before the Court any information or evidence that supports rejecting the conclusion compelled by the information presented in Suchlicki Affidavits.

In sum, because the Cuban Banks have defaulted in this action, they are deemed to have admitted to being "agencies or instrumentalities" of Cuba. Even if the default of the Cuban Banks were not decisive, the Suchlicki Affidavits provide sufficient facts—facts that the ACRs neither

analysis implicates foreign law. As such, "the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed.R.Civ.P. 44.1. The Suchlicki Affidavits are appropriately considered by the Court under this rule as well.

13. The Cuban Banks' refusal to appear and contest allegations of their agency or instrumentality in this and similar litigation is related to another of Petitioner's strong arguments for finding that at least one of the Cuban Banks is an agency or instrumentality of Cuba: the Southern District of New York has previously concluded as such with regard to Banco Nacional. *See Banco Nacional de Cuba v. Chemical Bank N.Y. Trust Co.*, 594 F.Supp. 1553, 1564 (S.D.N.Y.1984); *Weininger*, 462 F.Supp.2d at 498. The ACRs argue that these previous decisions cannot bind them, citing the doctrine of issue preclusion. Whether or not these cases definitively dispose of the question of "agency or instrumentality" in this case, they certainly show that the ACRs' substantive position on that issue has been rejected by prior courts. Coupled with the ACRs' failure to present any evidence suggesting that the Cuban Banks are not organs of Cuba, those past findings render the ACRs' position untenable here.

sufficiently dispute nor contradict—to establish that the Cuban Banks are agencies or instrumentalities of Cuba. As evinced by the submissions now before the Court, there is no dispute as to the material facts regarding the scope of the Cuban Banks' interests in the Blocked Funds. In the September 2010 Decision, this Court already held that interests such as those of the Cuban Banks' are sufficient as a matter of law to render the Blocked Funds subject to attachment and execution under the TRIA. Accordingly, Petitioner has demonstrated that there is no genuine dispute as to any material fact necessary to support her entitlement to execute upon the Blocked Funds.

## IV. *THE ADVERSE CLAIMANT RESPONDENTS' BACKSTOP ARGUMENTS*

 The ACRs make two additional arguments against the turnover of the Blocked Funds that merit discussion. First, the ACRs assert that, even if the plain meaning of the TRIA does mandate pre-emption of state property law,[14] the statute should be construed in harmony with state property law to avoid running afoul of the Takings Clause. Second, the ACRs assert that the TRIA does not apply retroactively to govern the disposition of assets blocked during transactions that occurred prior to the enactment of the statute.

These arguments fail, in part, because each asks the Court to consider the turnover of blocked funds outside the context of the initial blocking of those funds. The TRIA makes available for attachment and execution assets that have been blocked pursuant to the CACRs or other international sanctions regimes. The Supreme Court has long "recognized that the congressional purpose in authorizing blocking orders is to put control of foreign assets in the hands of the President." *Dames & Moore v. Regan,* 453 U.S. 654, 673, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981) (internal quotations omitted). From the moment they are blocked, the Blocked Funds be-

14. The ACRs argue that this Court should reevaluate its finding of preemption in light of the general presumption against preemption, an argument which had not been briefed prior to the September 2010 Decision, In advancing the applicability of the presumption against preemption, the ACRs rely upon *Export–Import Bank of U.S. v. Asia Pulp & Paper Co., Ltd.,* 609 F.3d 111 (2d Cir.2010). In *Asia Pulp & Paper,* however, the Second Circuit based its invocation of the presumption on the failure of the statute there to supply a definition of property interests subject to attachment and execution. The September 2010 Decision, however, found that the TRIA, read in its proper context, does define the relevant range of property interests. *See* September 2010 Decision at 531–32, Moreover, the presumption against preemption applies only to "field[s] which the States have traditionally occupied," *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (citation omitted), and though states are certainly the traditional fount of property law, federal law has long determined the rules governing suits against foreign governments, their agencies and instrumentalities, as well as laws implicating United States foreign policy and diplomatic interests. *See, e.g., N.Y. SMSA Ltd. P'ship v. Town of Clarkstown,* 612 F.3d 97, 104 (2d Cir.2010) ("The presumption has not generally been applied when a local government regulates in an area 'where there has been a history of significant federal presence.'" (quoting *United States v. Locke,* 529 U.S. 89, 108, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000)); *Weinstein,* 609 F.3d 43, 53 (2d Cir.2010) (discussing treaties negotiated at conclusion of World War II governing relationship between nations and their instrumentalities and agencies for purposes of executing judgments against foreign nations). Because the TRIA supplies a substantive definition of interests in property and governs an area of law that is historically within the purview of the federal government, the presumption against preemption cannot operate to alter the reading of the statute presented by the Court in the September 2010 Decision.

come " 'bargaining chip[s]' to be used by the President," and are "at his disposal." *Id.* The Trading With the Enemy Act (the "TWEA"), which the TRIA cites directly, permits the executive not only to "temporarily freeze assets," but also to "direct and compel" the "transfer, withdrawal, transportation, ... or exportation of ... any property in which any foreign country. has any interest ...." *Id.* at n. 5, 101 S.Ct. 2972. In other words, both before and after the passage of the TRIA, once assets are blocked, parties with an interest in those assets have no reasonable expectation that their interests will not be diminished or extinguished. *See also Smith ex rel. Estate of Smith,* 346 F.3d at 271 (finding that TRIA did not "divest" executive authority to confiscate blocked assets); *In re Islamic Republic of Iran Terrorism Litig.,* 659 F.Supp.2d 31, 123 (D.D.C.2009) ("[N]othing prevents the President from seizing Iranian assets and vesting title to them in the U.S. Treasury, as Presidents have often done in the interest of important foreign policy objectives."). Simply put, it would be unreasonable to rely upon frozen funds remaining as such until the relevant restrictions are lifted. This was the case both before and after the passage of the TRIA.

With that basic understanding in mind, the ACR's remaining arguments regarding the Takings Clause and the retroactive application of the TRIA may be easily dispensed.

## A. *THE TAKINGS ARGUMENT*

The ACRs argue that if the TRIA is interpreted to permit turnover here, the statute violates the Takings Clause and is unconstitutional as applied to blocked assets owned by third parties. Accordingly, the ACRs submit that the TRIA must be construed to avoid this unconstitutional outcome.

■ The canon of constitutional avoidance counsels that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. and Const. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988). Thus, to influence the interpretation of a statute based on this doctrine, an otherwise superior reading must create a serious constitutional infirmity.

■ The ACRs have failed to raise the specter of a serious constitutional defect in the Court's interpretation of the TRIA.

Although the Fifth Amendment states that no "private property [shall] be taken for public use, without just compensation," ... the Supreme Court has made clear that "[t]he government may not be required to compensate an owner for property which it has already lawfully acquired under the exercise of governmental authority other than the power of eminent domain."

*United States v. Davis,* 648 F.3d 84, 97 (2d Cir.2011) (internal citations omitted) (alterations in original).

■ For decades, Courts have rejected Takings Clause challenges to various applications of federal statutes that are related to the TRIA and deal with the execution or disposition of assets held in the United States but subject to foreign claims of interest. Courts have long recognized that "the [f]ederal [g]overnment is not barred by the Fifth Amendment from securing for itself and our nationals priority against" foreign creditors who also assert interests in property frozen in the United States pursuant to federal law. *United States v. Pink,* 315 U.S. 203, 228,

62 S.Ct. 552, 86 L.Ed. 796 (1942);[15] *see also Tole S.A. v. Miller*, 530 F.Supp. 999, 1004 (S.D.N.Y.1981) (summarizing *Pink* as "reject[ing] the contention of various foreign creditors of a Russian corporation that the Government of the United States had unconstitutionally taken property without just compensation by distributing American-based assets of the corporation to American citizens"). Over half a century ago, the Second Circuit recognized that even the "seizure of assets of non-enemy alien[s]" is a proper exercise of federal power where the seizure is "a means of avoiding the use of the property" to facilitate trade with enemy states. *Sardino v. Federal Reserve Bank of N.Y.*, 361 F.2d 106, 112 (2d Cir.1966) (*quoting Silesian American Corp. v. Clark*, 332 U.S. 469, 476, 68 S.Ct. 179, 92 L.Ed. 81 (1947)). Such is the case here, where many of the frozen EFTs were initiated to transmit assets to, from, or through Cuba's agencies and instrumentalities involving American financial institutions, and where several of the ACRs base their claims to the Blocked Funds on their having satisfied, through alternate channels of payment, those underlying obligations to the Cuban entities that occasioned the blocking of the EFTs in the first place.

The purposes of the statutory scheme here at issue—to provide redress to victims of terrorism, to punish terrorist entities by making their frozen assets subject to execution, and to discourage economic activity involving American financial institutions benefiting terrorist entities—defeat the ACRs' takings argument because they constitute public purposes beyond the mere redistribution of one private entity's property to another private party. *Cf.*

*Kelo v. City of New London*, 545 U.S. 469, 490, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005) (Kennedy, J., concurring) (holding that the takings clause forbids "transfers intended to confer benefits on particular, favored private entities with only incidental or pretextual public benefits"). The Second Circuit and other Courts of Appeals have endorsed as advancing valid public purposes statutes related to economic sanctions regimes that govern the blocking or execution of assets held in the United States. *See Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 54 (2d Cir.2010) (rejecting takings claim where foreign bank's "own conduct … opened it to liability for judgments already entered against" terrorist state); *Paradissiotis v. United States*, 304 F.3d 1271, 1275 (Fed. Cir.2002) (finding that blocking Libyan assets constituted "valid regulatory measure[ ] taken to serve substantial national security interests[,] [which] may adversely affect individual contract-based interests and expectations, but those effects have not been recognized as compensable takings for Fifth Amendment purposes").

Finally, a related point as to the ACRs' takings argument: The ACRs' takings argument is premised on the assertion that they are the legal owners of the Blocked Funds. The Petitioner lacks the basis to dispute the facts the ACRs allege in support of their claims to ownership, but assuming the ACRs do own the Blocked Funds, those assets are available for attachment and execution under the TRIA only because of the conduct of the ACRs themselves. They chose to do business with Cuba and its agencies or instrumentalities and they routed that business through the United States—whether by

---

**15.** The TRIA, just as the Litvinov Assignment at issue in *Pink*, seeks to provide financial redress for a class of American citizens—here, victims of international acts of terrorism, in

*Pink*, Americans harmed by the Soviet nationalization of the Russian economy. *Pink*, 315 U.S. at 210, 62 S.Ct. 552.

mistake or otherwise—and thus the assets in question were caught in the TRIA/CACRs net. Moreover, many of the ACRs have failed to seek, and all have failed to obtain the administrative relief the statute provides them: licenses from OFAC permitting them to unblock and retain the Blocked Funds, an act which would have removed the assets from the reach of the TRIA.[16] Where an entity's own conduct and affirmative choices, in the context of statutory or regulatory changes, result in its continued exposure to liability, such entities cannot then sustain a takings claim. *See Meriden Trust and Safe Deposit Co. v. F.D.I.C.*, 62 F.3d 449, 455 (2d Cir.1995) ("Meriden Trust chose to maintain its insured status after transferring its commercial banking activities to Central Bank, even in light of [a] provision added by [an intervening federal statute], thus voluntarily subjecting itself to a known obligation. Therefore, no unconstitutional taking occurred.").

Since there are several shortcomings with the ACRs' takings argument, the ACRs have failed to present a serious constitutional problem created by reading the TRIA to preempt state property law. Accordingly, the canon of constitutional avoidance does not alter the Court's conclusion on that point.

## B. *THE RETROACTIVITY ARGUMENT*

Finally, the ACRs argue that even if the TRIA does preempt state property law, it cannot be applied retroactively to support the turnover of assets frozen prior to the passage of the TRIA and owned by entities that are neither terrorist parties nor their agencies or instrumentalities.

A "statute, which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (internal quotations omitted). Determining whether a statute has retroactive effect is "not always a simple task, because '[a] statute [is not impermissibly retroactive] merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law.'" *Martinez v. I.N.S.*, 523 F.3d 365, 370 (2d Cir.2008) (*quoting Landgraf*, 511 U.S. at 269, 114 S.Ct. 1483) (alterations in original). "[T]he court must assess 'the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event,'" and determine "whether the new provision attaches new legal consequences to events completed before its enactment." *Id.* (*quoting Landgraf*, 511 U.S. at 269–70, 114 S.Ct. 1522). "If so, then the traditional presumption against retroactivity per-

---

16. Indeed, the opportunity to seek a license under the CACRs and assert their claims to actual ownership undermines the ACRs' citation to *United States v. Broverman*, 180 F.Supp. 631, 635 (S.D.N.Y.1959). The ACRs invoke *Broverman* for the proposition that "serious constitutional questions" would be raised by "taking of property of friendly aliens without just compensation." *Id.* However, that statement in *Broverman* is preceded by a explanation that the federal government had the power under the TWEA "to vest property of friendly as well as enemy foreign interests" and that no constitutional questions were raised because the statutory scheme provided for an opportunity for those friendly interests to be asserted. *Id.* So too here, as the ACRs have recourse to the OFAC licensing procedure and judicial review should they disagree with any OFAC licensing decisions. *See,* 31 C.F.R. § 501.801 (providing detailed instructions for applying for license to unblock frozen funds).

tains and the new statute must be construed as inapplicable to the event or act in question owing to the absence of a clear indication from Congress that it intended such a result." *Id.* (internal quotations and alterations omitted). Evaluating whether a "particular rule operates 'retroactively' comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event," which should be guided by "familiar considerations of fair notice, reasonable reliance, and settled expectations." *Landgraf,* 511 U.S. at 270, 114 S.Ct. 1483.

The proper focus, then, of the retroactivity inquiry in this case is to ask whether the passage of the TRIA "deprive[d]," third parties who hold interests in assets frozen under the CACRs "of legitimate expectations." *General Motors Corp. v. Romein,* 503 U.S. 181, 191, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992). The circumstances of this case simply cannot support the ACRs' contention that the TRIA upset their expectations as to the Blocked Funds.

Assets frozen in the United States under OFAC regulations are subject to a myriad of sources of potential diminution—including attachment and execution to satisfy judgments. As discussed above, the International Emergency Economic Powers Act (and the TWEA before it) provided the President with the discretion to confiscate assets blocked pursuant to OFAC regulations. *See Smith ex rel. Smith,* 346 F.3d at 271. This was true before the passage of the TRIA; it is still true. The President's authority to summarily dispose of blocked assets destroys any claim that the ACRs could have justifiably relied upon the Blocked Funds remaining in interest-bearing accounts until the ascension of a democratic regime in Cuba and a détente in U.S.-Cuban relations. Moreover, both prior to and after the passage of the TRIA, the same straightforward and obvious means to protect their interests from this persistent risk was and is available to the ACRs: Pursue an OFAC license.

When the ACRs participated in the EFTs, there was no doubt that routing such transactions through the United States would result in their being blocked. Once blocked—even at the time that the transactions were initiated—those funds were subject to United States jurisdiction and could be employed toward a panoply of ends pursuant to Congressional statutory policy and previously-delegated executive power. Under such circumstances, the application of the TRIA to funds blocked prior to its passage does not upset expectations or alter the legal consequences of routing EFTs through the United States to the agencies and instrumentalities of a terrorist state. When the ACRs engaged in that conduct, they could not have had a reasonable expectation that the Blocked Funds would be blocked indefinitely and maintained in safe-keeping, available only to them. Accordingly, orders granting turnover of the Blocked Funds in this case do not amount to an impermissibly retroactive application of the TRIA.

## V. *ORDER*

For the reasons stated above, it is hereby

**ORDERED** that the motions to intervene of Banco Bilbao Vizcaya Argentaria Panama, S.A. and Banco Bilbao Vizcaya Argentaria, S.A. (Docket No. 336), Premuda S.p.A. (Docket No. 311), Novafin Financiere, S.A. (Docket No. 319), LTU Lufttransport–Unternehmen (Docket No. 324), Caja de Ahorros y Monte de Piedad de Madrid (Docket No. 337), and Shanghai Pudong Development Bank Co. Ltd.

(Docket No. 354) are GRANTED; and it is further

ORDERED that the motion to strike of Petitioner Jeannette Hausler (Docket No. 380) is DENIED; and it is further

ORDERED that the motions of Petitioner Jeannette Hausler for judgment on the pleadings (Docket Nos. 264 and 268) are GRANTED; and it is further

ORDERED that the cross motions for summary judgment of Banco Bilbao Vizcaya Argentaria Panama, S.A. and Banco Bilbao Vizcaya Argentaria, S.A. (Docket No. 309), Premuda S.p.A. (Docket No. 313), Novafin Financiere, S.A. (Docket No. 320), LTU Lufttransport–Unternehmen (Docket No. 325), Caja de Ahorros y Monte de Piedad de Madrid (Docket No. 330), Estudios Mercados y Suministros, S.L. and Philips Mexicana S.A. de C.V. (Docket No. 340), and Shanghai Pudong Development Bank Co. Ltd. (Docket No. 342) are DENIED.

ORDERED that, within ten (10) days of the date of this Order, Petitioner submit a letter, of no more than five (5) pages in length, describing the posture of the case as it pertains to remaining adverse claimants in light of this Decision and Order, and specifically addressing the extent to which the Court's decision herein might apply to the resolution of any such claims.

**SO ORDERED.**